**UNITED STATES of America ex rel. Roy SCHUSTER, Relator-Appellant,**

v.

**Ross E. HEROLD, M.D., Director of Dannemora State Hospital, Dannemora, New York, Respondent-Appellee.**

No. 434, Docket 32194.

United States Court of Appeals Second Circuit.

Argued March 12, 1969.

Decided April 24, 1969.

Faith A. Seidenberg, George J. Alexander, Syracuse, N. Y., for relator-appellant.

Arlene R. Silverman, New York City (Louis J. Lefkowitz, Atty. Gen., for the State of New York, and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellee.

Before MOORE, KAUFMAN and FEINBERG, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

We have, thankfully, come a long way from the days when ignorance induced fear of the mentally ill. As great strides in psychiatric knowledge have been paralleled by evolving concepts of due process, humane procedures for the commitment and treatment of the mentally ill have replaced snake pits and witch hunts. The time has long since passed when a mere charge that one was "possessed by demons" would automatically result in banishment for insanity.

Petitioner's allegations in this proceeding must be weighed against this background of gradual development. These allegations, which are in the main uncontested, may be briefly summarized: In 1941, while incarcerated in Clinton State Prison, Roy Schuster expressed his belief in the existence of "corruption" in the prison administration. Shortly thereafter, solely on the strength of a prison doctor's finding the Schuster's charges evidenced "the paranoid idea that members of the [prison] personnel are against him," Schuster was transferred from Clinton to Dannemora State Hospital for the Criminally Insane. In accordance with New York law as it then stood, Schuster was afforded no meaningful hearing on the issue of his sanity, was not permitted the assistance of counsel, was given no opportunity to call his own witnesses, was given no advance notice of the nature of the transfer proceedings, and was transferred to Dannemora within twenty-four hours after he was first seen by the prison doctor.

Despite repeated attempts to void the transfer in both state and federal courts, Schuster remains in Dannemora, more than twenty years after he would have been eligible for parole had he not been transferred from Clinton. His petition was dismissed on December 8, 1967 by Judge Port below, after a hearing primarily devoted to the validity of Schuster's charges of prison corruption. At no time during the course of his several state and federal actions has the question of Schuster's sanity adequately been determined.

For the reasons we shall set forth, we believe that before a prisoner may be transferred to a state institution for insane criminals, he must be afforded substantially the same procedural safeguards as are provided in civil commitment proceedings, including proper examination, a hearing upon notice, periodic review of the need for commitment, and trial by jury. If these procedures result in a determination that Roy Schuster is sane, he should be returned to Clinton Prison, where he will be eligible for parole. As an observer has recently noted, those "twice cursed"—as criminal and as mentally ill—should not be "punished" for the "crime" of becoming mentally sick while serving a prison sentence. Morris, The Confusion of Confinement Syndrome: An Analysis of the Confinement of Mentally Ill Criminals and Ex-Criminals by the Department of Correction of the State of New York, 17 Buff.L.Rev. 651 (1968) [hereinafter cited as Morris].

I.

*Schuster's Crime and Trial*

During the 1920's, Roy Schuster was a successful tap-dancer, performing in theaters across the nation. His earnings were considerable by the standards of the day, reaching over $200 a week. On one tour through Milwaukee, Schuster, then 22, met a girl, fell in love, and after a brief courtship agreed to marry her, although he later insisted that she was pregnant by another man at the

time. At his wife's inducement, he abandoned the stage and settled down to raise a family. Accordingly, Schuster became a dance instructor at Ned Wayburn's dancing school at a substantially diminished salary. Being industrious, however, he was able to increase his weekly income to approximately $150.

Then came the Depression. Schuster's income was cut to $75 and then cut again and again to as little at $11 a week. As the creditors closed in, the romance evaporated. Schuster and his wife quarreled frequently and he even accused her of adultery and neglect of their daughter Coleen, then three years of age. The two separated, reconciled, and separated again. Schuster became so upset when the formal separation action was commenced that he attempted suicide. Mrs. Schuster responded to his distress by securing a court order directing Schuster to pay a fixed sum for the support of his family. Soon he found the payments burdensome and difficult to meet in those lean days. But Amy Schuster pressed for her payments. In settlement discussions she insisted that she would take no less than $40 a week, no matter how little Schuster was earning.

Finally, Mrs. Schuster threatened to have her husband jailed for contempt of court if he did not pay. Faced with this equivalent of the debtor's prison, Schuster became more distraught. He pleaded with his wife that if she went ahead with her plan, he would lose the small dance studio he had just opened and be irrevocably ruined with no benefit to anyone. During the course of settlement discussions the acrimony mounted and Schuster threatened suicide on several occasions. Finally, Amy agreed to meet him one morning to discuss the securing of the contempt order in front of 51 Chambers Street, New York where both Amy's and Roy's lawyers maintained offices.

Schuster and his wife met as planned. They went first to his lawyer's office but he was not in. They then proceeded to her lawyer's office. Schuster allegedly pleaded with Amy's lawyer, "Will you please give me a chance, let me explain the situation? Let me prove to you I have no money. If you put me in jail Monday, you will put me out of business. You will destroy my future, you will make me commit suicide." With that tragic peroration he drew a .32 caliber revolver from his pocket. Bedlam ensued and in the chaos Schuster fired several shots wounding her lawyer and killing his wife.

Subsequently, Schuster was indicted for murder in the first degree. His defense was that he had carried the revolver with the intention of committing suicide. He insisted that his wife's lawyer lunged for the gun when Schuster drew it from his pocket and that at the moment Schuster was in a state of "panic" and was not aware of what was happening. The gun, according to his testimony at the trial, somehow was discharged in all the excitement.

To rebut the claim of "panic" the state introduced expert evidence that Schuster was not suffering from any mental disease. The state's psychiatric expert, Dr. Perry M. Lichtenstein, then Resident Physician at the City Prison, denied repeatedly that Schuster was suffering from any form of delusion or mental disease. After a trial lasting one week, a jury found Schuster guilty of murder in the second degree. On November 2, 1931, Schuster, then 27 years old, was sentenced to a term of from twenty-five years to life.

A. *Schuster's Imprisonment*

Schuster was sent first to Sing Sing and then transferred in 1935 to Clinton State Prison. There he made a good adjustment. He taught a "cell-study" course leading to a high school equivalency degree, and even received a letter from the New York State Board of Education commending him for his work. In the normal course of events, Schuster might have expected to serve his time and to be eligible for parole in 1948,

when he was still not too old to build a new life. But, in 1941, life took another wrong turn for him. Schuster became convinced of corruption in the prison, particularly on the part of the official in charge of the prison education program. His expression of this belief led to his transfer to Dannemora State Hospital for the Criminally Insane. Although Schuster charges that the state "buried him alive" in Dannemora to prevent him from bringing the corruption to light, the district court was unconvinced the transfer was corruptly motivated. The state contends that there was no corruption, that Schuster was and is a "paranoid" and that his insistence upon the existence of a scandal is prime evidence of his delusion.

Schuster entered Dannemora on September 9, 1941, at the age of 37. Now 64 years old, he still languishes there.

Schuster's transfer to Dannemora accorded with the provisions of § 383 of the New York Correction Law, McKinney's Consol.Laws, c. 43, as it then read.[1] That section provided for automatic transfer upon the certification of a single prison doctor that the prisoner was "in his opinion insane." Schuster's commitment certificate, signed by Leaman H. Caswell, M.D., the physician at Clinton Prison, whose qualifications in psychiatry we are unable to determine from the record before us, sketchily summarized his single conversation with the prisoner, and went on to remark with breathtaking simplicity: "He was circumstantial in his conversation, very talkative, complained bitterly. He was paranoid and suspicious.. * * * This man was reported for writing letters regarding cowardly attacks made against him by the personnel and requested that something be done about it. In his letters he has shown the paranoid idea that members of the personnel are against him." Dr. Caswell attempted no further diagnosis of Schuster's condition except for the understandable observation that the prisoner was "depressed." Although the certificate explicitly requested information as to whether the patient was "violent, dangerous, destructive, excited, * * * homicidal or suicidal," Dr. Caswell did not indicate Schuster exhibited any of these symptoms.

### B. Hearing in the District Court

At the hearing before Judge Port, Schuster testified that in 1941 he met with two doctors, Dr. Caswell and a physician from Dannemora State Hospital for what appears to be a very brief period. Schuster had no warning that the interview was to determine his sanity. He testified that the two doctors devoted most of their "diagnostic" efforts to persuading him to recant his charges. This conversation was the only "hearing" Schuster received. At no time was he afforded an opportunity to cross-examine the

1. New York Correction Law § 383 then read:
"TRANSFER OF PRISONERS IN STATE PRISONS, REFORMATORIES AND PENITENTIARIES AND IN THE INSTITUTION FOR MALE DEFECTIVE DELINQUENTS TO DANNEMORA STATE HOSPITAL.—Whenever the physician or the psychiatrist of any one of the state prisons, reformatories or penitentiaries or of the institution for male defective delinquents shall certify to the warden or superintendent thereof, that a male prisoner confined therein and sentenced or committed thereto for a felony, is, in his opinion insane, such warden or superintendent shall cause such prisoner to be transferred to the Dannemora state hospital and delivered to the medical superintendent thereof. Such superintendent shall receive the prisoner into such hospital, and retain him there until legally discharged. The warden or superintendent, before transferring any insane prisoner, shall see that he is in a state of bodily cleanliness [and is provided with a new suit of clothing similar to that furnished to prisoners on their discharge from prison]. At the time of such transfer, there shall be transmitted to the superintendent of such hospital the original certificate of conviction and the certificate of insanity executed by the physician or psychiatrist, which shall be filed in the office of such superintendent who shall file a notice of such transfer in the office of the department of correction."

doctors or to present evidence of any kind to contradict the "diagnosis" of these two prison doctors, neither of whom so far as we know, had any expertise in psychiatry. And at its conclusion, he testified, he was told to sign a twelve page transcript of the proceeding without being permitted to read its contents.[2] Schuster was not represented by counsel during the proceedings, although he requested an adjournment to secure legal assistance. There is nothing in the record before us which indicates the doctor from Dannemora ever expressed any opinion on Schuster's commitment.

As indicated, Schuster would have become eligible for parole in 1948, had he remained in Clinton. His present situation is far different; the district court judge observed that the present policy of the Parole Board appears to preclude the possibility of parole for any prisoner as long as he is in Dannemora Hospital. Schuster had a perfunctory hearing on the question of parole in 1948, but apparently no further action has been taken since that date.[3]

It is of some interest that Judge Port expressly noted that at Dannemora Schuster had received no medication or treatment other than infrequent interviews with a staff doctor. The reason for this apparent neglect according to Dr. Izaak Gorlicki, assistant director of Dannemora, is that Schuster's paranoia is so "deeply rooted" that it would not respond to therapy. Moreover, Schuster has not been assigned to any work duty. When Schuster was asked by Judge Port if he did any work "up there," he explained, "Not now. I did for a while. I was librarian, but other than that, I study in my spare time and things like that to try and prepare for an honorable rehabilitation so that when I was released I wouldn't step out cold, I would

be able to step into an honorable job * * *"

It is to be noted that there is general agreement that Schuster is not in need of custodial detention. At the hearing below, Dr. Gorlicki characterized his behavior at the hospital as "Very quiet. Cooperative. Has never been any problem in management. He has never been insulting to anyone." Asked on cross-examination if Schuster was being confined as criminally insane because of misbehavior, the Doctor replied "No, he behaves good [sic]. As a matter of fact he is a very useful person. He is isolated from the hospital and he keeps to himself, and seldom converses with the officers. He never makes any request unless he needs something."

From this testimony we are forced to the unhappy conclusion that Schuster is simply a forgotten man in a mental institution which has nothing to offer him. He receives no treatment, is not occupied in therapy of any kind, he appears not to be in need of the Dannemora type of confinement and is able to keep his equilibrium only through his own efforts and his hope that he is preparing himself for the day when he will be released.

### C. Petitions for Habeas Corpus

Since 1948, Schuster has repeatedly challenged his commitment to Dannemora in the New York State courts but in each instance to no avail. His petitions in the state courts for habeas corpus asserting his sanity were dismissed in 1950, 1960 [before the New York courts permitted such a challenge in People ex rel. Brown v. Johnston, 9 N.Y.2d 482, 215 N.Y.S.2d 44, 174 N.E.2d 725, (1961)] and on October 2, 1962. Another petition, dated December 27, 1962 led to a hearing in a state court

2. This transcript was not found in petitioner's file, nor was its existence ascertained at the hearing below.

3. While, theoretically, the Parole Board has authority to parole Schuster directly

from Dannemora, 1944 Op.Atty.Gen. 117, in practice the Board does not parole anyone who is incarcerated in a mental institution for the presumption is that he is mentally ill.

in March 1963 at which Schuster was represented by assigned counsel.

At the 1963 state hearing, only one psychiatrist, a Dr. Carson, testified. He admitted that Schuster was "an individual whose conduct in general is correct, who uses impeccable logic" and that "he shows no obvious signs of mental illness such as deterioration, untidiness, hallucinatory experiences, bizarre ideas or bizarre behavior." Nonetheless, Dr. Carson concluded that Schuster was mentally ill since he had a paranoid condition. "This is the type of illness," Carson explained, "in which an entire delusional but logical belief is based on a single false premise, and if one allows the truth of the false premise the patient's behavior no longer appears abnormal * * *" Dr. Carson conceded that while *he* could believe cheating took place in the Regents' examinations in the prison, and that prison officials would be reluctant to have depositions submitted to that effect, he could not believe that anyone would commit a man to a hospital for the criminally insane because of it. Accordingly, he concluded that Schuster must be insane. He was unmoved by Schuster's claim, which the state did not deny, that the prison warden, chief clerk and controller had been dismissed shortly after Schuster made his charges of corruption. We note, further, that the court in the 1963 hearing, refused to consider the legality of Schuster's transfer to Dannemora and concentrated only upon his then sanity. The court thus dismissed the writ, a decision affirmed by the Appellate Division, 3 Dept., 22 App.Div. 2d 762, 253 N.Y.S.2d 534 (1964) and, without opinion by the New York Court of Appeals, 15 N.Y.2d 968, 259 N.Y.S.2d 856, 207 N.E.2d 527 (1965).

Undaunted, Schuster initiated a petition for habeas corpus on July 13, 1965, in the United States District Court for the Northern District of New York, alleging that he was sane and that the state procedure by which he was adjudged insane and transferred to Dannemora was unconstitutional. In considering Schuster's request for assignment of counsel after the district court's dismissal of that writ, this court after reviewing the transcript of the 1963 hearing remanded the proceeding to the district court by an order dated February 28, 1967 for an evidentiary hearing on the issue whether the initial transfer to Dannemora was corruptly motivated and directed that counsel be assigned. A hearing on this remand was held on July 12, 1967, during which the court examined not only the issue of corrupt transfer but also such questions as whether petitioner was mentally ill in 1941, and is now, and whether the procedures which had been accorded petitioner were proper. Judge Port again dismissed the writ on December 8, 1967, and this appeal followed.[4]

## II.

### *The Right to a Full Hearing*

Schuster has maintained that his transfer to Dannemora in 1941 was effected in violation of his right to equal protection of the law under the 14th Amendment. His claim is grounded on the contention that he was not given the same procedural rights in contesting the transfer which are afforded civilians similarly facing involuntary commitment to a mental institution. It is urged on his behalf, therefore, that he be returned to Clinton Prison where he will be eligible for parole and at least be removed from the grievously distressing atmosphere of an institution like Dannemora which houses the insane.

A. *The Effect of the Transfer from Clinton Prison to Dannemora*

The state characterizes Schuster's transfer from Clinton to Dannemora as

---

4. Schuster did not request a certificate of probable cause before filing this appeal. He did, however, make such a request at an earlier stage of the proceedings and Judge Port granted the certificate after denying Schuster's 1965 petition. At oral argument, we announced that a further certificate was not required. See 28 U.S.C. § 2253.

no more than a mere administrative matter, claiming that it represented a simple change in the place of detention and that this action was beyond the purview of judicial review. See People ex rel. Sacconanno v. Shaw, 4 App.Div.2d 817, 164 N.Y.S.2d 750 (3d Dept.1957); Urban v. Settle, 298 F.2d 592 (8th Cir. 1962); 18 U.S.C. § 4241.[5] "There is no doubt," as the Supreme Court has recently remarked, "that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene. It is clear, however, that in instances where state regulations applicable to inmates of prison facilities conflict with such rights, the regulations may be invalidated." Johnson v. Avery, 394 U.S. ——, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). It is not to difficult, in this regard, to discern that a transfer of the character confronting us involves rights of the nature described by the Supreme Court. Not only did the transfer effectively eliminate the possibility of Schuster's parole, but it significantly increased the restraints upon him, exposed him to extraordinary hardships, and caused him to suffer indignities, frustrations and dangers, both physical and psychological, he would not be required to endure in a typical prison setting.

The adversities and rigors of an institution such as Dannemora have been catalogued in a scholarly and persuasive study of the problem by a distinguished committee of the Association of the Bar of the City of New York. Special Committee on the Study of Commitment Procedures and the Law Relating to Incompetents of the Ass'n of the Bar of the City of New York, Mental Illness, Due Process, and the Criminal Defendant 23–26 (1968) [hereinafter cited as N.Y. Bar Report]. The members of this eminent body included New York State's Commissioner of Correction, a deputy commissioner of the Department of Mental Hygiene, four state Supreme Court Justices, the Director of Matteawan State Hospital, the Director of Central Islip State Hospital, the Director of Psychiatry at Bellevue Hospital, New York, two assistant district attorneys, the Director of the Mental Health Information Service for the First Judicial Department, a professor of law, and other distinguished practicing attorneys and physicians. It spent two years exhaustively studying the problem, aided by an able staff under the direction of Malachy T. Mahon, now Dean of the Law School of Hofstra University. As a measure of its position as a respected initiator of needed reforms, we notice that the Committee's prior report, made in 1962, led to substantial changes in the Mental Hygiene Law, McKinney's Consol.Laws, c. 27, particularly in what is now §§ 72–74, the procedures for involuntary civil commitment.

In considering the problem posed we are faced with the obvious but terrifying possibility that the transferred prisoner may not be mentally ill at all. Yet he will be confined with men who are not only mad but dangerously so. As the New York Courts have themselves indicated, he will be exposed to physical, emotional and general mental agony. Confined with those who are insane, told repeatedly that he too is insane and indeed treated as insane, it does not take much for a man to question his own sanity and in the end to succumb to some mental aberration. Cf. Dennison v. New York, 49 Misc.2d 533, 267 N.Y.S.2d 920 (Ct.Cl. 1960), rev'd on other grounds 28 App. Div. 608, 280 N.Y.S.2d 31 (3d Dept. 1967); People ex rel. Cirrone v. Hoffmann, 255 App.Div. 404, 407, 8 N.Y.S.2d 83, 86 (3d Dept.); People ex rel. Brown v. Johnston, *supra.*

---

5. Although the State argued that the prisoner commitment procedures in the federal system are analogous to New York Correction Law § 383, the validity of those federal procedures is not before us now.

Moreover, the facts reveal that there always lurks the grisly possibility that a prisoner placed in Dannemora will be marooned and forsaken. For example, Matteawan State Hospital is the functional equivalent of Dannemora for those convicted of misdemeanors, for female prisoners and for those civilly committed who are found to be dangerous under Mental Hygiene Law § 85. See Correction Law § 400. The commitment procedures for prisoners to either hospital are identical. See Correction Law § 408. Matteawan has 119 inmates who have been confined there since 1935, 29 since 1925, and 4 patients who have been there since at least 1915—over half a century. Morris, *supra*, at 656. The New York Bar Association study discloses the startling information that as of November 1, 1965, one inmate, then 83 years old, had been at Matteawan since 1901, when as an uneducated boy of 19 years he was imprisoned in this maximum-security institution for the insane. N.Y. Bar Report at 72. The study also reveals another individual who was accused of stealing a horse and buggy in 1905, committed to Matteawan after pleading not guilty and found to suffer "acute delusional insanity." This inmate was more fortunate than the former; he was released 59 years later at the age of 89 because he was no longer "a menace to society or other patients." N.Y. Bar n. 1 at 72. See also Dennison v. State, *supra*, in which the plaintiff was initially awarded $115,000 in damages after wrongly spending 24 years in Dannemora because he had stolen candy valued at $5.00 at the age of 16.[6]

Moreover, there is considerable evidence that a prolonged commitment in an institution providing only custodial confinement for the "mentally sick" and nothing more may itself cause serious psychological harm or exacerbate any pre-existing condition. As one psychiatrist has explained: "[U]nder prevailing conditions, we super-impose new disabilities on existing disabilities—at least in many cases—when we forcibly commit sick people to places called mental hospitals which in reality remain custodial asylums." Hearings on Constitutional Rights of the Mentally Ill before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 87th Cong., 1st Sess. pt. 1 at 44. And, as another has warned: "There is repetitive evidence that once a patient has remained in a large mental hospital for two years or more, he is quite unlikely to leave except by death. He becomes one of the large mass of so-caller 'chronic' patients." Bloomberg, A Proposal for a Community-based Hospital as a Branch of a State Hospital, cited in Katz, Goldstein & Dershowitz, Psycho-Analysis, Psychiatry & the Law, at 664 (1967).[7]

---

6. The spectre of unwarranted commitment of such lengthy duration may be somewhat diminished by recent statutory provisions requiring periodic review for non-criminal persons involuntarily committed to state mental institutions, Mental Hygiene Law § 73, and decisions leading to similar review for committed prisoners at the time their sentences expire. See *Baxstrom, infra*. None of these developments however offer any comfort to persons in Schuster's position, since the former are by their terms inapplicable to prisoners, and even the latter is of little help to one serving a long sentence.

7. And a New York court commented, 30 years ago, that:
"It would be unnecessary to point out that relator's fundamental rights would be infringed, when sentenced to a state prison for normals, were he to be confined with mental defectives whose appearance, speech, and personal habits are abhorrent, as clearly as would be the case if he were required to live in a madhouse, or in fear of injury by untrained or unmanageable animals, if he were constantly subjected to offensive odors, or if confined for long periods to a dungeon or solitary confinement, or, like Byron's Prisoner of Chillon, he were chained to a dungeon pillar. Constant association with imbeciles, and suffering from the personal behavior associated with many of them, doubtless tend * * * to force the normal to grow like them * * *. The law of this State recognizes the fact that men-

In addition, by its very nature, confinement at an institution for the criminally insane is far more restrictive than at a prison. Nothing more dramatically illustrates this difference than the petty indignities to which inmates in the former are subjected. For example, their visiting and correspondence rights are curtailed. In the appendix we reproduce a pro se petition by a prisoner in a similar institution in Massachusetts listing at least thirty-five such differences illustrating that these seemingly small but numerous indignities may accumulate to the point where the prisoner-patients consider them the most galling of all restraints.

■ Finally as the court below stated, prisoners held in Dannemora are in practice not even called for hearing by the Parole Board. By contrast, had Schuster remained in Clinton, he might have returned to society over 20 years ago. Additionally, as long as Schuster is considered insane, New York law prevents him from seeking to vacate his original conviction by a writ of *coram nobis*. People v. Booth, 17 N.Y.2d 681, 216 N.E.2d 615, 269 N.Y.S.2d 457 (1966).

We are not alone in attributing significance to a transfer from a prison to an institution for the criminally insane. Recognizing that such a transfer may cause further substantial deprivation of liberties, New York's own courts have permitted a prisoner to challenge his transfer by writ of habeas corpus. People ex rel. Brown v. Johnston, *supra*. Thus, the New York Court of Appeals stressed that "any *further* restraint *in excess* of that permitted by the judgment or constitutional guarantees should be subject to inquiry. An individual, once validly convicted and placed under the jurisdiction of the Department of Correction * * * is not to be divested of all rights and unalterably abandoned and forgotten by the remainder of society."

9 N.Y.2d at 485, 215 N.Y.S.2d at 45–46, 174 N.E.2d at 726 (emphasis in the original).

■ Accordingly, we would delude ourselves if we believed that a prisoner's transfer to a prison maintained for the criminally insane is a mere administrative matter. Prison and asylum are divided by far more than the few miles that separate Clinton and Dannemora. In view of the substantial deprivations, hardships and indignities such a move may produce, judicial scrutiny is necessary to ensure that the procedures preceding the transfer adequately safeguard the fundamental rights of the prisoner.

### B. *Differences in Commitment Procedures for Prisoners and Civilians*

Under § 383 of the Correction Law, as it read at the time of Schuster's transfer in 1941, a prisoner could be transferred to Dannemora solely on the certification of a single doctor (even a non-psychiatrist), without a hearing or judicial review of any kind. However, at that time an involuntary commitment of a civilian to a mental institution required the examination of two qualified examiners (instead of a single prison physician, who conceivably could be influenced by Schuster's charges that the institution he served was corrupt), notice of the commitment proceedings (Schuster claims he was not told in advance of the nature of the proceeding which led to his transfer and was transferred within 24 hours after he was seen by a prison doctor), a hearing before a judge on the question of sanity, which insured the right of cross-examination, etc., and a court order of commitment—none of which was afforded Schuster. Law of April 24, 1933, ch. 395 § 12, [1933] Laws of N.Y. pp. 931–34 (repealed 1965; now replaced by N.Y. Mental Hygiene Law §§ 72–74).

---

tal cruelty may be quite as real and quite as devastating as physical pain." Peo-

ple ex rel. Cirrone v. Hoffmann, 255 App. Div. 404, 8 N.Y.S.2d 83 (3d Dept.1938).

## C. *Equal Protection*

We believe that the substantial disparity between the procedural protections afforded civilians facing involuntary commitment to a mental institution and those given Schuster deprived him of the equal protection of the laws, within the meaning of the Fourteenth Amendment. This is the only logical deduction that can follow from an analysis of recent Supreme Court decisions on the subject.

Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) sparked an awareness that we cannot tolerate two classes of insane persons—criminal and non-criminal,—when we are asked to examine commitment procedures available to both. In that case, the Court struck down § 384 of New York's Correction Law, which dealt with the commitment procedures for persons transferred to Dannemora as prisoners, whom the state wished to keep institutionalized after the expiration of their prison sentences. The procedures for commitment provided by § 384 were basically the same as those for civilly-committed persons except that the latter had the right to *de novo* review by jury trial of the question of their sanity under § 74 of the Mental Hygiene Law, whereas prisoners in Baxstrom's position did not. Additionally, the decision whether to send a person committed under § 384 to Dannemora or to a civil hospital was completely within the discretion of administrative officials, while one civilly committed could be sent to Matteawan only after a judicial determination that his presence in a civil hospital would be dangerous to the safety of others. Mental Hygiene Law, § 85. These differences the Court held, in a unanimous opinion, constituted a denial of equal protection. It rejected absolutely the state's argument that one could validly distinguish between the two groups because ex-convicts *ipso facto* had dangerous or criminal propensities. Positing that prisoners whose sentences are about to expire are entitled to the same procedural protection before further confinement as civilians who face initial commitment to a mental institution, Chief Justice Warren explained: "Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all.*" 383 U.S. at 111, 86 S.Ct. at 763 (emphasis in the original).

Judge Port believed *Baxstrom* inapposite to the case at bar. He reasoned that because Johnnie Baxstrom was nearing the end of his sentence when he was committed under § 384 and hence was no longer a prisoner, his commitment was in effect "civil" and had to meet the standards of every other civil commitment. Since Schuster is still a prisoner, Judge Port concluded, he is entitled only to the same treatment as every other prisoner in custody.

This analysis, we believe, misses the mark. *Baxstrom* clearly instructs that the *procedures* to be followed in determining whether one is committable must be unaffected by the irrelevant circumstance that one is or has recently been under sentence pursuant to a criminal conviction, although the fact that one has committed a crime may be relevant to the substantive conclusion that he is mentally ill. As one court explained: "The Supreme Court struck down the New York system not because Baxstrom was reaching the end of his sentence, but because it held dangerousness is not relevant to the procedures for determining whether a 'person is mentally ill at all.' * * * *Baxstrom* thus might be said to require the conclusion that, while prior criminal conduct is relevant to the determination whether a person is mentally ill and dangerous, it cannot justify denial of procedural safeguards for that determination." Cameron v. Mullen, 387 F.2d 193, 201 (D.

C. Cir. 1967). See also People v. Fuller, 24 N.Y.2d 292, at 306, 300 N.Y.S.2d 102, at 110, 248 N.E.2d 17, at 23 (1969).

The teaching of *Baxstrom*—that a finding of dangerous or criminal behavior does not obviate the necessity for a separate and adequate determination of commitability—has also found application in other related cases. Thus, for example, this court declared even before *Baxstrom* that an ex-convict who became insane after his release from prison could not be denied the same hearing available before commitment to one who had never been incarcerated. United States ex rel. Carroll v. McNeill, 294 F. 2d 117 (2d Cir. 1961),[8] appeal dismissed as moot 369 U.S. 149, 82 S.Ct. 685, 7 L.Ed.2d 782 (1962).

■ *Baxstrom* has also extended its influence to other related instances. Both the New York courts, People v. Lally, 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E.2d 87 (1966) and the federal courts, Cameron v. Mullen, *supra,* Bolton v. Harris, 395 F.2d 642 (D.C. Cir. 1968), have made it clear that one who has been adjudicated not guilty by reason of insanity is entitled to the same procedures used to determine committability of an individual who is not otherwise before a court. In *Lally,* the court embraced not only the specific holding of *Baxstrom,* but its broad purpose as well, since the court declared its intent was "[t]o comply with the spirit if not the express language of the *Baxstrom* decision." 277 N.Y.S.2d at 660, 224 N.E.2d at 92.

In Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), the Supreme Court, again in a unanimous holding, further sharpened the distinction between a finding of criminal activity and a finding of committability by reason of mental illness, holding that a *convicted* sex offender was entitled to a further hearing on the question of illness before he could be sentenced to an indefinite term as an "habitual offender and mentally ill." *Specht* has since been followed by New York and applied to this state's sex offender statute. People v. Bailey, 21 N.Y.2d 588, 289 N.Y.S.2d 943, 237 N.E.2d 205 (1968).

In People ex rel. Goldfinger v. Johnston, 53 Misc.2d 949, 280 N.Y.S.2d 304 (Sup.Ct.1967), a New York court has extended the *Baxstrom* rationale to a youth transferred from a correctional school (where he was placed after pleading guilty to attempted assault), to an institution for defective delinquents. The court remarked, in requiring a hearing before the transfer could be effected "whatever procedural distinctions and niceties may hitherto have obtained, they are no longer valid since the advent of *Baxstrom, Specht* and *Lally*." 280 N.Y.S. 2d at 307.

Most recently, in People v. Fuller, *et al., supra,* the New York Court of Appeals declared that persons convicted of felonies or misdemeanors who were then committed for treatment as narcotics addicts were entitled to a jury trial on the question of addiction. The court reasoned that since non-criminals civilly

---

8. Judge Waterman, writing for a panel which included Chief Judge Lumbard and Judge Woodbury of the First Circuit sitting by designation, made the point with clarity:

"We find nothing to demonstrate that ex-convicts who, after expiration of their sentences, become mentally ill, are inherently more dangerous than those mentally ill who are not ex-convicts. In fact there are many 'criminal tendencies' that are in no way violent tendencies just as there are many convicts and ex-convicts whose crimes were non-violent crimes. Nor, even if such an ex-convict should become dangerously insane, does there appear to be any justification for more hastily transferring him to Matteawan after his commission of a dangerous act at an ordinary mental hospital than in transferring any other patient who has committed such an act at such a hospital but whose transfer is nevertheless delayed until after he shall have had a judicial hearing." 294 F.2d at 123.

committed for addiction were given such a trial, it would violate the equal protection clause of the 14th Amendment to deny this right to those addicts who happened to be concurrently convicted of a crime. The court relied upon Baxstrom v. Herold, reading that case, as we do, to require an examination of the substance of the proceeding, not its form. It found commitment for treatment basically a proceeding involving a sick person who needed help. Schuster was sent to Dannemora for the same reason. He was alleged to be mentally sick (paranoid) and those transferring him there did so, we are told, for his "care and treatment." Accordingly we see no logic or reason for distinguishing Schuster's plight from Fuller's. See also In re Buttonow, 23 N.Y.2d 385, 297 N.Y.S.2d 97, 244 N.E. 2d 677 (1968).

D. *The Procedures Now Followed for Commitment of Criminals and Civilians*

Since Schuster's transfer to Dannemora in 1941, New York has substantially revised its commitment procedures both for prisoners and non-prisoners,[9] indicating a continuing concern that the power to lock people away in "lunatic asylums," whether they be criminals or no, is awesome indeed, and can be abused.

Section 383 of the Correction Law now affords prisoners many of the safeguards that the Mental Hygiene Law provided to civilians in 1941. Before a prisoner may be transferred to Dannemora, he must be given an examination by two independent physicians and on appropriate notice a hearing at which the prisoner can introduce evidence and cross-examine witnesses, and judicial approval must also be secured. N.Y. Correction Law § 383 (McKinney 1968).

At the same time, however, the commitment procedures for non-prisoners have undergone still greater expansion.

Thus, in addition to the two-physician certification, and provisions for appropriate notice, hearing and court action, New York also requires for persons being committed involuntarily, review of the need for further confinement 60 days after commitment, another review after one year, followed by periodic reviews every two years thereafter. These regular periodic reviews require in each instance a judicial determination of the need for further institutionalization. Mental Hygiene Law § 73 (McKinney, 1968 Supp.). Moreover, when any of these determinations is adverse to the civil patient, he may obtain *de novo* review on the issue of sanity by a jury. Mental Hygiene Law § 74 (McKinney, 1968 Supp.). New York has also created a "Mental Health Information Service" whose function it is to study and review the admission of involuntary civilian patients, inform the patients of their rights, present relevant information to the court, and participate in the proceedings mandated by §§ 72–74, etc. Mental Hygiene Law § 88 (McKinney, 1968 Supp.). See Note, The New York Mental Health Information Service: A New Approach to the Hospitalization of the Mentally Ill, 67 Colum.L.Rev. 672 (1967). Thus, it is true, as a sage commented, that time is what we want most but use worst, for there remains today almost as wide a chasm between the roads traveled by non-prisoners and prisoners as existed in 1941 when Schuster first arrived at Dannemora.

We believe, as we have already indicated, that implicit in Baxstrom v. Herold is the principle that such disparity as exists even under the present statutes between the procedural rights afforded prisoners and those extended to non-prisoners violates the fundamental requirements of equal protection. Whether a man should be committed for mental illness has no relevance to the place where he happens to be at the

9. Correction Law § 383, added L.1962 c. 393, amended L.1964 c. 105; Mental Hygiene Law §§ 72–74, amended L.1964 c. 738.

time he becomes ill. This much we have surely learned from *Baxstrom* and its progeny.

 We hold, therefore, that before a prisoner may be transferred to Dannemora, he is entitled to substantially the same procedures including periodic review of the need for continued commitment in a mental institution and jury trial as are granted to civilians when they are involuntarily committed to a mental hospital. Morover, it does not seem amiss for us to remind those who will conduct the required hearings that the substantive test to be applied is that which New York has laid down for those facing civil commitment: not merely whether Schuster suffers from a "mental disease," but whether that disease is one that "requires care and treatment." Mental Hygiene Law § 2. (See our discussion of Schuster's treatment, *infra*.)

 In holding as we do we wish to emphasize that we are mindful of the Supreme Court's admonition that "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made." *Baxstrom, supra,* 383 U.S. at 111, 86 S.Ct. at 763. See also Griffin v. Illinois, 351 U.S. 12, 20, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Thus, our decision today does not mean that all distinctions between civilian and prisoner patients must be swept aside. We do say that prisoner patients are entitled to *substantially* the same safeguards afforded non-prisoners before commitment. For example, § 85 of the Mental Hygiene Law provides that before being committed to Matteawan, there must be a judicial determination that the individual to be committed is dangerous to himself and others. Such a

procedure may not be appropriate for a prisoner because the additional security facilities of Matteawan or Dannemora might be thought necessary to confine convicts with sentences still to serve, who may be more prone to escape from a hospital than civilians.[10]

The Bar Association Committee after long study phrased its results in the following recommendations which are in substantial agreement with our conclusions today:

"*General Principles*

"Mentally ill prisoners serving sentences should continue to be hospitalized in institutions under the jurisdiction of the Department of Correction. However, the procedures governing their hospitalization should be modified to provide to such persons some of the rights accorded to civil patients. Safeguards against unnecessary and possibly harmful confinement among the mentally ill are as necessary and important for prisoners as they are for anyone else.

"Recommendation No. 1 (*Admission procedure*). The Correction Law (sections 383, 408) should continue to provide for hospitalization of mentally ill prisoners under sentence in an institution within the Department of Correction upon judicial order entered after notice, examination by two examining physicians, and an opportunity to be heard. In addition, however, these statutes should be amended to provide that the Mental Health Information Service should receive notice of such applications, and should have the same powers and perform the same services as set forth in Article 5 of the Mental Hygiene Law as to civil patients.

10. The New York Bar Report considered and explicitly rejected the concept that the commitment provisions for civilians and prisoners should be identical. See N.Y. Bar Report at 20. Moreover, that

Committee endorsed the practice of maintaining separate facilities for prisoners who become mentally ill, instead of sending them to civil hospitals.

"Recommendation No. 2 (*Periodic review*). The procedures for the involuntary retention and periodic judicial review of ordinary civil patients, including on the occasions of such review the assistance of the Mental Health Information Service, should apply to prisoners hospitalized while serving a sentence."

N.Y. Bar Report at 2.

### E. *The Adequacy of Existing Remedies*

██ The state has vigorously argued that Schuster has already received all rights to which he is entitled in his 1963 state habeas corpus hearing. We believe however, as did the Supreme Court and the New York Court of Appeals, that habeas corpus is not an adequate substitute for a proper pre-commitment hearing. The writ was available to the patients in both *Baxstrom* and *Lally,* yet neither court deemed this remedy sufficient. Instead they concluded that equal protection required the same procedural protection for ex-prisoners and those acquitted by reason of insanity as was afforded those civilly committed. See Cameron v. Mullen, *supra,* at 201; Bolton v. Harris, *supra.* Schuster's 1963 hearing indicates how inadequate the great writ can be in circumstances such as this. Only one doctor testified, and he was a man in whom Schuster placed no trust. The insubstantiality of that doctor's testimony may be characterized as follows: Schuster believes in corruption. I don't believe such corruption existed, ergo Schuster is insane.

██ In particular, the burden of proof in a habeas corpus proceeding is traditionally upon the petitioner. Bolton v. Harris, *supra.* In the case before us, the district court's finding on the crucial question of corruption was simply that Schuster has "failed to sustain the burden of proof on this issue." In a commitment proceeding, by contrast, the burden traditionally seems to have been on the state. Moreover, it may well be that the New York courts will no longer permit habeas corpus as a proper remedy for prisoners committed under § 383 in the belief that the amendment of that section in 1962 obviated the need for the writ, granted for the first time just one year before the amendment in People ex rel. Brown v. Johnston. See People ex rel. Carroll v. Herold, 27 App. Div.2d 958, People ex rel. Conover v. Herold, 24 App.Div.2d 773, 263 N.Y.S. 2d 858 (3d Dept.1965); N.Y. Bar Report n. 26 at 23.[11]

### F. *Effect of Our Holding*

Most judicial reform is accompanied by cries of horror and dismay that the action by the court has surely carried society over the brink and into the abyss of administrative chaos. Certainly this was true of *Baxstrom.* When § 384 was invalidated, the New York authorities decided to transfer all patients confined in Dannemora or Matteawan pursuant to that provision—a total of 992 inmates—to civil hospitals. This transfer was designated by them as "Operation Baxstrom."[12] When this decision was

---

11. Although Judge Port on remand did make a determination that Schuster was mentally ill, we believe that the 1967 hearing was inadequate. Counsel had been instructed by the terms of our order that the hearing would be limited to the single question of the veracity of Schuster's charges of prison corruption. And, indeed, Judge Port interpreted the hearing as limited to that issue. Therefore, it is quite obvious from the hearing transcript that counsel were not prepared to present evidence or argument on the matter of Schuster's sanity. In fact, the issue was first introduced by the state on cross-examination. Counsel assured us at oral argument that they have expert witnesses who are prepared to testify that Schuster is sane; and Schuster must be given a proper opportunity to present his case.

12. See generally Morris, at 670–75; N.Y. Bar Report 221–28.

announced, some segments of the community were anxious and outraged. Involved labor unions demanded special pay and training for working with the Operation Baxstrom transferees because they were presumptively "dangerous." Residents in the neighborhoods of civil mental hospitals protested the presence of "criminal lunatics" in their midst. Yet in only one year the protests evaporated. The transfer has been an astounding success. Of these nearly 1000 ex-prisoners whom the appropriate state authorities had prior to *Baxstrom* determined to be too dangerous to be placed in a civil hospital, 176 have been fully discharged—147 to their home communities and the rest to other hospitals; 454 others have elected to remain in civil mental hospitals on voluntary or informal status; and only seven have had to be returned to Matteawan after a judicial determination that they were dangerous. As one author has noted, the Baxstrom patients were almost as pure as Ivory Snow; they were 99$^{28}$/$_{100}$ per cent free from dangerous mental illness. See Morris, *supra,* at 672.

What could explain this massive misplacement of people in Matteawan and Dannemora—places which are more restrictive prisons than hospitals? The New York Bar Report indicated it was "another instance of institutionalized expectations putting blinders on our perceptions." N.Y. Bar Report at 227. The very fact that these men were in Dannemora may have induced the circular reasoning which impelled the New York authorities to the conclusion that they were "dangerous." Perhaps independent judicial examination of patients in Dannemora pursuant to the guidelines laid down in § 73 may contribute to an atmosphere permitting clearer vision. At the very least, the results of Operation Baxstrom indicate that it is not unlikely that a significant number of the patients

committed to Dannemora under § 383— particularly those committed under the pre-1962 law like Schuster—may not be so mentally ill as to require denying them the "freedom" of a regular prison.

In any event, we do not believe our decision today even though it requires *inter alia* periodic review of the need to continue prisoners in institutions for the criminally insane will open the proverbial floodgates and unduly burden the courts with frivolous cases. We cannot safely predict that every prisoner-patient will demand the review we here make available. For example, 454 of the patients transferred to civil hospitals in Operation Baxstrom, nearly half the total number, chose to remain hospitalized on a voluntary basis even though they could have contested the validity of their commitment in court by jury trial. N.Y. Bar Report n. 32 at 26. Also, a six-year study of civil commitment procedures by the American Bar Foundation confirms this premise. Its authors state: "In practice this right [to the jury trial in civil commitment proceedings] is seldom invoked, either in California or in those other jurisdictions included in this study. So infrequent are they that over the several months occupied in the study of Los Angeles we were able to observe only two jury trials." Rock, *et al.,* Hospitalization and Discharge of the Mentally Ill, at 102 (1968).

But even in the unlikely event that every prisoner in a Department of Correction mental hospital does demand the full panoply of procedures to which he is entitled, the total number of such prisoners under sentence at one time is so small compared to the number of involuntarily committed civilians in state mental hospitals that the effect on the administrative and judicial systems would be minimal. N.Y. Bar Report at 26. On April 1, 1964, there were 85,279 resident patients in the civil state hos-

pitals. At the same time there were fewer than 2,971 patients *of all classes* in *both* Matteawan and Dannemora combined. State of N. Y., Dept. of Mental Hygiene, Office Directory of State and Licensed Mental Institutions 176 (1965) as quoted in N.Y. Bar Report at 26.[13] Moreover, The Department of Mental Hygiene has provided us with statistics which indicate that during the fiscal year ending March 31, 1968, 25,439 persons were involuntarily admitted to state civil mental hospitals, while 152 persons were admitted to Dannemora and 255 to Matteawan. Further, the New York Court of Appeals summarily dismissed the argument that its courts would be burdened when that court ordered jury trials for all criminals committed for treatment of narcotics addiction. People v. Fuller, *supra*, 24 N.Y.2d 292, 300 N.Y.S.2d 102, 248 N.E.2d 17. And it is a fair assumption that the number of addicts involved far exceeds the number of prisoners committed under § 383. We thus add but a trickle of water to an ocean. When measured against the possibility that persons committed as summarily as Schuster were wrongly subjected to the horrors of a prison for the insane, any inconvenience is so small by comparison that we cannot ignore our obligation to re-examine their cases. If we open any "floodgate" today, which we doubt, it is only to provide a flood of long-overdue relief.

### III.

*Schuster's "Treatment" at Dannemora*

At the hearing before Judge Port the rules of evidence were, as he noted in his opinion, "applied with a liberality probably not warranted by the remand." In this manner, evidence concerning the treatment accorded Schuster at Dannemora has been called to our attention. As we have already illustrated, that evidence tends to suggest that Schuster does not now receive any therapeutic treatment and does not presently need the merely custodial care with which the institution provides him.

■ The sole purpose served by Dannemora State Hospital is "confining and caring for such male prisoners as are declared mentally ill while confined in a state prison * * * and others provided for under section three hundred eighty-three." Correction Law § 375. And, according to New York law, one is "mentally ill" when he is "afflicted with mental disease to such an extent that for his own welfare or the welfare of others, or of the community, *he requires care and treatment*." Mental Hygiene Law § 2(8) (emphasis added).[14] The statutory scheme thus contemplates that a prisoner will be committed to Dannemora only if he is mentally ill *and* in need of treatment or special custodial care because of the problem he presents to himself or other prisoners. The legislature appeared to presume that one committed under its provisions would be provided with adequate care or treatment, the need for which justified the commitment.

In Rouse v. Cameron, 125 U.S.App. D.C. 366, 373 F.2d 451 (1966), the court indicated that persons committed to a

---

13. Note that these figures were prepared prior to Operation Baxstrom, which may have involved half of the population of Dannemora. See N.Y. Bar Report at 220.

14. "Care and treatment" are themselves defined as "medical care, surgical attendance, nursing and medications, as well as food, clothing and maintenance, furnished to a patient." Mental Hygiene Law § 2 (6).

mental hospital after pleading not guilty by reason of insanity have a constitutional right to treatment while institutionalized. Similarly the Supreme Judicial Court of Massachusetts recently declared that one accused of murder but who has been confined in a state mental hospital for the criminally insane instead of being sentenced to prison has a right to challenge the legality of his confinement if the state fails to provide him with adequate treatment. Nason v. Superintendent of Bridgewater State Hospital, 233 N.E.2d 908 (Mass.1968). Indeed, New York courts have themselves taken some steps toward acknowledging this right, at least in relation to those sentenced to indefinite terms as sex offenders. See People ex rel. Kaganovitch v. Wilkins, 23 App.Div.2d 178, 259 N.Y.S.2d 462 (4th Dept.1965); People v. Jackson, 20 App.Div.2d 170, 245 N.Y.S.2d 534 (3d Dept.1963); see also People v. Mosher, 24 App.Div.2d 47, 263 N.Y.S.2d 765 (4th Dept.1965). And, in People v. Fuller, *supra,* the New York Court of Appeals stressed the fact that the program under consideration was one for the rehabilitation of addicts, not merely for their detention. Moreover, a growing number of scholars have urged that persons involuntarily committed by the state to mental institutions have a constitutional right to treatment, grounded in either the prohibition against cruel and unusual punishment of the Eighth Amendment or in the due process or equal protection clauses of the Fourteenth Amendment. E.g., Note, Civil Restraint, Mental Illness, and the Right to Treatment, 77 Yale L.J. 87 (1967); Morris, *supra,* at 679–81; Birnbaum, The Right to Treatment, 46 A.B.A.J. 499

(1960). See also Sas v. Maryland, 334 F.2d 506, 509 (4th Cir. 1964); Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758; Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966).

■ While these cases deal with persons who are not currently under a sentence of imprisonment as Schuster is, it may be that this difference in and of itself does not provide an adequate basis for denying him the same protections. The incidence of having been convicted of a crime surely does not deprive a person of all constitutional protections for the duration of his sentence. See, e.g., Wright v. McMann, 387 F.2d 519 (2d Cir. 1967). While we do not pass upon the possibility of such a constitutional right to treatment, we are of the view that, in light of the procedural posture of this case, the state may wish to reexamine the validity of its confinement of Schuster in Dannemora without the treatment for which he was originally committed since it is conceded he does not need purely custodial detention in a mental hospital.

■ A procedural barrier prevents us from deciding this highly significant question now since Schuster has not yet raised it in the state courts. He brings his case to us, via a petition for a writ of habeas corpus. But see Wright v. McMann, *supra.* In such a situation 28 U.S. C. § 2254 requires that "[a]n application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the ap-

plicant has exhausted the remedies available in the courts of the State * *." [15]

Arguably, Schuster does not have a remedy in the State courts since New York has held that a civilly-committed patient may not contest the adequacy of his treatment by habeas corpus but must make use of the administrative procedures available under § 86 of the Mental Hygiene Law, which authorizes the Commissioner of Mental Hygiene to conduct investigations and issue reasonable orders in this regard. People ex rel. Anonymous No. 1 v. La Burt, 17 N.Y.2d 738, 270 N.Y.S.2d 206, 217 N.E.2d 31 (memorandum decision), cert. denied, 385 U.S. 936, 87 S.Ct. 299, 17 L.Ed.2d 216 (1966). However, we believe that the New York courts may wish to consider the applicability of that decision, especially as to prisoners such as Schuster, and due consideration for proper federal-state relations makes it appropriate that we give them an opportunity to do so. Accordingly, we believe that in this particular case it is appropriate that we decline to consider whether Schuster may be further confined in Dannemora absent adequate treatment until he has presented his claims to a state court. We note further that the hearing on the question of Schuster's committability may moot this issue entirely.

We have dealt here solely with the criminal who allegedly becomes mentally ill after his imprisonment. We have not had any need to concern ourselves in this opinion with the individual who is found not guilty by reason of insanity, or who claims he is incapable of assisting counsel in the preparation or defense of his case; that task has been performed by other courts. See Bolton v. Harris, People v. Lally, *supra*. With this in mind, we can see little justification for utilizing substantially harsher commitment procedures to segregate for care and treatment the mentally sick criminal from the "normal" criminal than society uses when it determines the mentally sick civilian should be institutionalized for care and treatment and separated from the "normal" civilian. Mental illness is mental illness whether it afflicts the criminal or the king.

In sum, we require that Schuster be given a hearing on the question of his sanity with substantially all the procedures granted to noncriminals who are involuntarily committed as patients in civil mental hospitals. If these procedures result in a determination that Schuster is not mentally ill he is to be returned to Clinton State Prison. The order is reversed and the case is remanded to the district court with instructions to hear and determine petitioner's application unless a hearing is held by the courts of the state determining under the standards set forth herein the issues Schuster raises within 60 days from the date of issuance of the mandate herein, or such further time as the District Court may for good cause allow.

We wish to thank George J. Alexander and Faith A. Seidenberg who were assigned to represent the petitioner, for their able presentation of the issues in this case.

---

15. We note the possible argument that Schuster is not "in custody pursuant to the judgment of a State court" since he is in Dannemora under § 383 a purely administrative transfer. However, he would not be subject to § 383 unless he were originally convicted by a state court. Moreover, a state court did consider and reject his claim in his 1963 habeas corpus proceeding.

# APPENDIX

NOTE 5

## Brief of Donald McEwan, Petitioner Pro Se

By means of the following chart the petitioner proposes to show in detail the penal nature of his confinement [at Bridgewater Treatment Center]. Any one item taken separately is trivial, but together they reflect an attitude, so difficult to represent in any other way, which is even more punitive than that of the administration of the state prison at Walpole.

Though institutional officials may allege otherwise, the only rationale behind the more restrictive rules and regulations of the treatment center is punishment—punishment of those persons whom the commonwealth has declared to be sick. Such treatment is totally destructive of the supposed rehabilitative purpose of the statute.

### C. SOME PROBLEMS 1. WHAT THERAPEUTIC SETTINGS ARE APPROPRIATE?

#### COMPARISON OF PUNITIVE MEASURES

| Item | Treatment Center | State Prison at Walpole |
|---|---|---|
| Personal clothing | Limited to 3 pairs white underwear, 6 pairs white or gray socks, 1 pair shoes without steel shank. May be ordered only at specified times. | Allowed any color underwear, socks, sweatshirts, bathrobe, pajamas, slippers, shoes without regard to shank, black or blue sweater. No limit, many items availble in canteen. |
| Institutional clothing | Always wrinkled, usually ill-fitting, frequently worn out. All marked by messy stencil with "T.C." and name. Can change only at specified times and places. Cannot have institutional underwear if have personal. | One pair pressed each week; proper size; replaced when worn-out. Shirt only marked, neatly, with name. Change as required in own cell. Underwear issued to everyone. |
| Punishment (lock-up) | No semblance of trial. Any guard may order. | Only disciplinary board (composed of deputy supt., a guard, and a civilian employee). |
| Rules and procedures | Different for night and day. | Same all the time. |
| Free time | Required to be either in yard or rec. room (no choice) or locked in cell. | Choice of yard, TV rooms, gym, chapel, own cell (which is open), other cell-block rec. areas. |
| Avocational area (free time) | Can enter and leave shops at only one specified time each night. | Can enter and leave whenever shops are open. |
| Library | Cannot browse; no catalog available. | Open daily for browsing; catalog available. |
| Visiting | 1 hour once a week across table with wire fence underneath. | All morning or afternoon (2½ hours) twice a week, in chairs side by side. |
| Lawyer visit | In presence of guard. | Private. |
| Guards | Always "standing over your shoulder," causing tension. Harassment common. | Discreetly apart. Leave well-behaved inmates alone. |
| Rules | Continually being added. | Infrequent changes. |
| State job | Assigned arbitrarily; just work under threat; little variety. | Inmate's preference consulted in assignment and job changes. Greater variety of jobs. |
| Pay | More than 50% make lowest wages. Little opportunity for increase. | Only 25% make lowest wage. Easy to move to better paying job. |
| Marching | To work, evening recreation, church, entertainments, meals. | Only to meals and entertainments. |
| Entertainments | Sometimes forced to attend. | Always optional. |
| Common medications (aspirin, cold pills, etc.) | Handed out a dose at a time. | 3 days supply or more given at once. |
| Food and menu | Frequently insipid and unimaginative. | Good quality, good preparation and imagination. |
| Time to eat | Frequently rushed at night. | Can remain until finished. |
| Meal schedule | Too close for digestion. (18 hour fast at night.) | Well spaced. (13 hour fast at night.) |
| Silverware | Frequently only a spoon. Always counted. | Always have appropriate utensils. Not counted. |

ON COMPETENCY TO BE FREE—Part Three. ADMINISTRATION AND SUPERVISION

| Item | Treatment Center | State Prison at Walpole |
|---|---|---|
| Cells | No lockers; no control of light from inside; no lamps allowed. No smoking. Arrangements of furniture, blankets, etc. specified in detail. No glass objects or food allowed. | Wall locker provided; light switch inside; lamps allowed. Smoking allcwed. No specification on arrangement. Glass objects and food allowed. |
| Institutional radio | None. | Two stations on earphone in cell. |
| Sleep at night | Frequently disturbed by guards. | Rarely disturbed. |
| Corridors | No smoking (though guards may). | Smoking allowed. |
| Personal safety razor | Not allowed. | Issued by institution and available in canteen. |
| Personal appearance | Told when to get haircut, shave. No beards allowed. | Left to individual. Beards allowed. |
| Canteen orders | Must be made 4 days in advance. One order per week. | Six times a week by order (same day delivery). A summer canteen in yard daily for purchases in person. |
| Canteen | Operated by civilians. High prices, low profits. | Operated by inmates. Low prices, high profits. |
| Cigarette lighters, nail clippers, metal ballpoint refills, stingers | Not allowed. | Available for purchase in canteen. |
| National slick magazines (Life, Newsweek, etc.) | Censored and sometimes mutilated. | Not censored; delivered intact. |
| Sanitary facilities | Primitive, no running water in cell; showers available only at specified times; frequently only 1 toilet for entire population (100+). | Modern toilet and basin in cell; showers available any free time. |
| Minimum security section | None. | Yes. |
| Trustee status | None. | Opportunities to work outside the wall. Special passes inside. |
| Mail | Frequently delayed by being passed to various persons. Outgoing certified mail may take weeks. Supt. includes apology in all mail to public officials. Censor stamp used on all mail. | Prompt delivery both incoming and outgoing. No unauthorized missives enclosed. Censor stamp not ordinarily used. |
| Inmate Council | Appointed by staff. | Elected by inmates. |

Katz, Goldstein and Dershowitz PSYCHOANALYSIS PSYCHIATRY AND LAW at 701–702 (1967)

◆

MOORE, Circuit Judge (dissenting):

This case comes before us as an appeal from an order of a federal district court which denied a writ of habeas corpus to a prisoner in a New York State prison. The petition for the writ challenged the legality of his transfer in 1941 from the Clinton Prison to the Dannemora State Hospital (mental cases).

Since I am particularly concerned with the trend towards judicial legislation by the federal courts, I feel that I should set forth my views. And to place this case in a proper factual setting, I must first state what this appeal does not, in my opinion, involve.

We are not reviewing (or at least should not be) the life of Roy Schuster and the matrimonial difficulties which plagued him. Not knowing the facts, I am not qualified, as the majority seem to be, to pass on the merits of the "industrious" Schuster, who after a "tragic peroration" drew from his pocket a revolver with which he killed his troublesome wife and wounded his lawyer, thus attempting to follow Shakespearean precepts. Nor am I prepared to speculate on the merits of his defense that he was in a state of panic and did not know what he was doing. Schuster was indicted for first degree murder. His plea must have made some impression on the jury because he was convicted of second (instead of first) degree murder and was sentenced to imprisonment for a period of from twenty-five years to life. Since there is no record of any appeal, it may well be that Schuster in 1931 preferred life to death.

These events brought Schuster to Sing Sing and then to the Clinton Prison.

The merits of Schuster's model life in prison and his expectancy for parole in 1948 are interesting history but not relevant to the issue before us.

In 1941 Schuster was transferred to Dannemora, which transfer concededly "accorded with the provisions of § 383 of the New York Correction Law as it then read [1]", namely, upon the certification of a single prison doctor. Again, I am not in a position (and I have some doubt as to whether the majority is) to know of the doctor's "qualifications in psychiatry" or to find that his opinion was delivered with "breathtaking simplicity."

At the hearing in 1967 before Judge Port, Schuster is said to have testified that in 1941 he met with two doctors but with modern-day enlightenment the majority find that Schuster was "not represented by counsel" and was not "afforded an opportunity to cross-examine the doctors." He certainly received no *Miranda* warnings, assuming that Miranda was old enough at the time to be warned of anything except not to touch hot stoves. From the record the majority concludes in a quasi-psychiatric-legal way that they are "forced to the unhappy conclusion that Schuster is simply a forgotten man in a mental institution which has nothing to offer him." On the prescriptive side, they find that since he receives "no treatment, [and] is not occupied in therapy of any kind" that, therefore, "he appears not to be in need of the Dannemora type of confinement and is able to keep his equilibrium only through his own efforts and his hope that he is preparing himself for the day when he will be released." But whether he should have treatment or not, or should have Dannemora confinement, is not in my opinion a problem to be solved by a federal court of appeals. New York State has its own laws enacted by enlightened legislators and its own competent judiciary. We are not dealing with the laws and practices of a barbarous nation. Before we dictate to the State and override State procedures, we should exercise a modicum of that "due process" which

is so easy to impose on others but so difficult to impose on oneself.

In my opinion, it is not for us to review and question the various State proceedings from 1948 to date. The only problem facing us on this appeal is what are Schuster's rights, if any, today and how may they be secured?

A bibliography of the books and newspaper articles concerning the sad plight of those confined in State and Federal mental institutions would be encyclopedic. I accept the nobleness of purpose which prompts such writings and would, with them, wish that a magic wand or pill could cure all the mental ills that so increasingly seem to beset so many. And the majority may know (I do not) of the "indignities, frustrations and dangers, both physical and psychological," which Schuster is enduring. Nor do I think that this is the time or place to speculate as to "the grisly [a word made popular as a result of Fay v. Noia, 372 U.S. 391, at 440, 83 S.Ct. 822, 9 L.Ed.2d 837] possibility that a prisoner placed in Dannemora will be marooned and forsaken." Shades of the Bastille and 1789!

Nor would I find it helpful to decision here to review the cases of various persons committed to Matteawan or the case of the gentleman in Massachusetts whose *pro se* petition lists *in extenso* some 35 items which he finds distasteful in his Massachusetts prison. Our problem is not to enact judicial legislation for the State of New York or to write opinions for its Court of Appeals but rather to examine its laws and decisions to ascertain whether they are the product of a benighted State. We must think and act in the light of present conditions. The majority apparently relate the present to the past because they say "the substantial disparity between the procedural protections afforded civilians facing involuntary commitment to a mental institution and those given Schuster deprived him of equal protection of the laws, within the meaning of the Fourteenth Amendment." In short, must all prisoners now confined in mental institutions be accord-

ed retrospectively the prospective rights of mentally ill civilians? Of course, such a hypothesis would be an impossibility. However, such rights currently bestowed may be a guide to a solution here.

We are not (or certainly should not be dealing with an abstract situation such as future transfer of prisoners who may be mentally ill. Therefore, I take issue directly with the majority's attempted enactment of a New York law which they phrase as "before a prisoner may be transferred to Dannemora, he is entitled to substantially the same procedures including periodic review of the need for continued commitment in a mental institution as are granted to civilians when they are involuntarily committed to a mental hospital." Furthermore I regard it as highly presumptuous on our part to "remind those who will conduct the required hearings that the substantive test to be applied is that which New York has laid down for those facing civil commitment."

Nor is a person suffering from a mental disease entitled to release from a mental institution merely because "treatment" is not recommended or has not as yet been discovered. If "treatment" there be, no one should oppose every effort to cure, and I would willingly join that "growing number of scholars [who] have urged that persons involuntarily committed by the state to mental institutions have a constitutional right to treatment, grounded in either the prohibition against cruel and unusual punishment of the Eighth Amendment or in the due process or equal protection clauses of the Fourteenth Amendment." How shocked would be the draftsmen of the Constitution if they had known that they were protecting the right to treatment of the mentally ill exclusively for ultimate federal court decision. Rather, in my opinion, they would have said that such questions should be reserved for the States.

The key to the proper solution here is to be found in the majority opinion. They "believe that the New York courts may wish to consider the applicability of [People ex rel. Anonymous No. 1 v. La-Burt, 17 N.Y.2d 738, 270 N.Y.S.2d 206, 217 N.E.2d 31], especially as to prisoners such as Schuster, and due consideration for proper federal-state relations makes it appropriate that we give them an opportunity to do so." And with their conclusion I agree, namely, "that in this particular case it is appropriate that we decline to consider whether Schuster may be further confined in Dannemora absent adequate treatment until he has presented his claims to a state court."

When these claims are presented as indicated, I have little doubt but that the State courts, which are showing as much concern for the mentally ill as the majority evince here, in the light of their recent decisions will afford Schuster a full opportunity to present his case on the merits with the privilege of necessary witnesses and counsel retained or appointed.

In People ex rel. Brown v. Johnston, 9 N.Y.2d 482, 215 N.Y.S.2d 44, 174 N.E. 2d 725 (1961), a prisoner validly incarcerated in the Attica State Prison had been transferred for mental reasons to Dannemora State Hospital. He sought to challenge this removal by a writ of habeas corpus. The Court of Appeals held that the writ could be invoked "to obtain a hearing to test the validity of a commitment in an institution for the criminally insane" (p. 485, 215 N.Y.S.2d p. 46, 174 N.E.2d p. 726) and that "a denial of a writ, thereby precluding a hearing to test sanity, would be egregious" (p. 486, 215 N.Y.S.2d p. 46, 174 N.E.2d p. 727).

In People v. Lally, 19 N.Y.2d 27, 33, 277 N.Y.S.2d 654, 659, 224 N.E.2d 87, 91 (1967), the Court said, "The appellant can always (as he has done in the past in habeas corpus) challenge the validity of his continued detention by alleging and showing that he is not in fact insane. Also, he can make an application under subdivision (5) of section 454, as he has done here, and ask for a hearing as to his present condition."

These decisions, read in connection with People v. Jackson, 20 A.D.2d 170,

245 N.Y.S.2d 534 (1963), and People v. Bailey, 21 N.Y.2d 588, 289 N.Y.S.2d 943, 237 N.E.2d 205, (1968), are a fair indication that the courts in New York would give full consideration to Schuster's application for relief. This conclusion is reinforced by the decision of the United States Supreme Court in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), wherein the Court said at p. 115, 86 S.Ct. at p. 765, "In order to accord to petitioner the equal protection of the laws, he was and is entitled to a review of the determination as to his sanity in conformity with proceedings granted all others civilly committed under § 74 of the New York Mental Hygiene Law. He is also entitled to a hearing under the procedure granted all others by § 85 of the New York Mental Hygiene Law to determine whether he is so dangerously mentally ill that he must remain in a hospital maintained by the Department of Correction."

My dissent is based upon the inconsistency of talking about federal-state relations and having Schuster present his claims to a State court and then decreeing that "Schuster be given a hearing on the question of his sanity with substantially all the procedures granted to noncriminals who are involuntarily committed as patients in civil mental hospitals," and that if "these procedures result in a determination that Schuster is not mentally ill he is to be returned to Clinton State Prison." About all that is lacking in such a decree is the number of the cell he is to occupy temporarily and a direction to the State Parole Board that they convene and release him at once. I also find a substantial inconsistency between telling Schuster to present his claims to a State court and remanding his case to the district court with instructions to hear and determine petitioner's application "unless a hearing is held by the courts of the state determining under the standards set forth herein the issues Schuster raises within 60 days from the date of the issuance of the mandate herein, * * *." In other words, the New

York courts are to exercise no independent judgment but merely to accept without question the new federally-created statute for the State of New York which the majority has enacted and then abjectly follow the majority's views as to the proper operation of the State's prison system.

My desire to have Schuster's present condition properly and adequately tested is as great as the majority's. If he should no longer be in Dannemora (and from the papers before us this would appear to be probable), then he should be transferred to a non-mental prison, and should be given the type of consideration accorded by the Parole Board to all eligible prisoners. But all these procedures should, in my opinion, be under the auspices of the courts of New York until complete disregard of its laws and decisions is shown. Therefore, I would affirm the decision below. When, as and if such recourse to State courts is had, Schuster is, of course, free to seek further relief from the federal courts in the light of the State court's proceedings and the results thereof.