THE PEOPLE OF THE STATE OF NEW YORK ex rel. THOMAS CIRRONE, Respondent, *v.* JOHN L. HOFFMANN, Superintendent of the Institution for Male Defective Delinquents, Napanoch, N. Y., Appellant.

Third Department, November 23, 1938.

John J. Bennett, Jr., Attorney-General [Bernard L. Alderman and Patrick H. Clune, Assistant Attorneys-General, of counsel], for the appellant.

*Sidney O. Raphael,* for the respondent.

McNamee, J. Relator was a prisoner in the State prison at Dannemora, he having been sentenced November 5, 1928, for a term of twenty-five years. In May, 1934, he was transferred by the prison authorities from Dannemora State Prison to the Institution for Male Defective Delinquents at Napanoch, as a result of *ex parte* and administrative proceedings pursuant to section 439 of the Correction Law. By the proceedings in May, 1937, now before this court for review, the prisoner sought an adjudication upon his mentality, and his return to a State prison as a convict of normal intelligence. In his petition he alleges that he was not a defective, nor a defective delinquent, and, therefore, he could not legally be confined in an institution intended and used, as prescribed by law, for the care and custody of idiots, and other inmates of varying degrees of imbecility or moronity.

A hearing was had before the Special Term, and evidence was taken, including that of the relator who was examined at length. The relator's mental condition was passed on judicially for the first time in this proceeding. The court found that the relator was not a mental defective, but was a person of average intelligence; and we regard that finding as amply supported by the evidence thus far submitted.

The first question here is whether a convict sentenced to State prison may be " transferred " from a State prison to an institution created and maintained by the State for the custody and care of idiots and imbeciles, and held there.

No question is raised as to the right of the department to transfer a prisoner from one State prison to another State prison generally, as a matter of prison management; nor as to the right to transfer a *mental defective* from a State prison to Napanoch. But rather the contention arises over the right of the Department of Correction to hold a convict of average intelligence, sentenced to State prison, in an institution of very different character, despite the repellent conditions arising from and the regulations made necessary by the idiocy and imbecility of the inmates. A State prison to which felons were sentenced is well understood at common law and under the Penal Law; and the Correction Law recognizes and continues the character of that institution. We now have in this State six State prisons, named in the statute; and the Institution for Male Defective Delinquents at Napanoch is not one of them (§ 70). And in that section it is stated that the State prisons are maintained " for the security and reformation of prisoners of this State." And by sections 131 and 149 the Correction Department is given power to transfer prisoners " from one State prison to another;" but the sections do not provide for the transfer of a prisoner from a State prison to any other class of penal or custodial institution.

The Commissioner and the Commission have control of lockups, police stations, jails, etc. (§ 46). But it would be challenging indeed to conclude that they had power to transfer prisoners, convicted of serious felonies, for safekeeping in any of such institutions. This leads quickly to the conclusion that the power of transfer from one place of confinement to another is not absolute, nor solely at the will of the Correction Department. The statute says there may be transfer "from one State prison to another."

There is no warrant for the *commitment* of a convict to Napanoch, except he be " A male mental defective " (Correction Law, § 438); and by that section, if a prisoner is thought to be one, he may be transferred as provided "in the next section." And section 439 authorizes such a transfer only when the prison physician "shall certify " to the warden that in his judgment a prisoner is a mental defective, and when the warden " shall notify " the Commissioner; and when the Commissioner " shall cause " the prisoner to be examined in the manner required by section 438. And if the prisoner shall be " found " by two examiners to be a mental defective, then upon their " certificate " the transfer may be effected by the warden.

From an examination of the statutes, it is evident that a transfer to or the imprisonment at Napanoch does not have for its underlying reason the matter of prison management, but the good of the public and that of the prisoner. The statutes do not define " mental defect," " mental defective," nor " mental deficiency;" but Webster's Dictionary (1935 ed.) denominates these as " marked subnormal intelligence," " lack of intelligence," and that in varying degrees of the descending scale of moronity, imbecility and idiocy. With that understanding, such a transfer or such imprisonment rests basically on the abnormal mentality of the convict. And that conclusion is strengthened by the purpose for which Napanoch was created and is maintained, viz., " for care, treatment, training and custody " of mental defectives (§§ 430, 438). And those who are familiar with that institution know, and the courts may take judicial notice, that practically all degrees of imbecility are present in the inmates there; and the mental condition of such inmates, as a matter of common knowledge, necessitates " care, treatment, training and custody," which would have no place in the lives of mentally normal convicts in State prisons. The purpose and provisions of the statute give character and classification to the institution with finality.

Of course, a convict may not choose the State prison in which he will serve his sentence. But that is not the question here. He is being detained in a class of institution to which a prisoner of normal intelligence may not be committed, or in which he may

not be confined, as a matter of law. And in view of the finding of fact that the relator is of average intelligence, there is no warrant in law for holding him there, as the record now stands.

A second question arises on the argument before the court, in which the relator advanced the claim that his present imprisonment at Napanoch deprived him of constitutional rights by subjecting him to surroundings and associations with offensive inmates of low mentality; and that this form of imprisonment constitutes the infliction of cruel and unusual punishment. (State Const. art. 1, § 5.) It would be unnecessary to point out that relator's fundamental rights would be infringed, when sentenced to a State prison for normals, were he to be confined with mental defectives whose appearance, speech and personal habits are abhorrent, as clearly as would be the case if he were required to live in a madhouse, or in fear of injury by untrained or unmanageable animals, if he were constantly subjected to offensive odors, or if confined for long periods to a dungeon or solitary confinement, or, like Byron's Prisoner of Chillon, he were chained to a dungeon pillar. Constant association with imbeciles, and suffering from the personal behavior associated with many of them, doubtless tend, in the normal, following Byron's thought, to crush the " Eternal spirit of the chainless Mind," and to " destroy the mysterious balance between mind and matter," and to force the normal to grow like them, otherwise to impose on the prisoner a loneliness among his fellows akin to solitary confinement, a " fixedness without a place." The law of this State recognizes the fact that mental cruelty may be quite as real and quite as devastating as physical pain.

The State urges, however, that it was deprived of full opportunity to cross-examine relator's witnesses and to pursue a full inquiry, and makes the failure in those particulars a basis of its right to a further hearing. It is evident from the record that the trial was in some degree informal, as is not unusual in habeas corpus proceedings. It is our view that there should be not only adequate investigation, but also the exercise of caution to avoid undue limitation of the parties in the matter of proof when fundamental rights are under consideration.

The evidence offered by the relator to characterize the degree of mentality of the other inmates actually confined at Napanoch, their habits and practices, and to indicate the degree of repulsiveness to which a prisoner of normal intelligence is there subjected, if any, is extremely meager and to be drawn, in the main, from the statutes. The court concludes on the whole case that the proceeding should be remitted to the Special Term for further hearing, in the interest of justice and regularity, and for the reception of such further evidence as may be offered.

The order should be reversed and the proceeding remitted, without costs.

HEFFERNAN, J., concurs; HILL, P. J., concurs in the finding of the Special Term that the relator was of normal mentality, as the evidence now shows; and favors a further hearing before the Special Term upon the grounds last stated in the opinion; RHODES and BLISS, JJ., dissent, and vote to reverse the order and to dismiss the petition, on the ground that the prison authorities having performed an administrative act within the scope of their statutory powers, there is nothing for the court to review.

Order reversed on the law and facts, and matter remitted for a further hearing.