Richard S. Heller, J.
This is an action for false imprisonment based upon the allegedly unlawful confinement of the claimant at Dannemora State Hospital from September 17, 1936 to December 16,1960.
The notice of intention and claim were duly filed and in view of this finding, the State’s motion for dismissal based upon the alleged noncompliance with the Statute of Limitations must be denied.
The illegality of the claimant’s confinement for the period indicated and the State’s liability for any damages arising out of such confinement is unquestionable. As in Troutman v. State of New York (273 App. Div. 619), the claimant was held over at Dannemora pursuant to section 384 of the Correction Law, under color of an order which had been obtained without notice.
Even if notice had been given, the United Stales Supreme Court has, since the trial of this claim, held that the statutory procedure utilized by the State in continuing claimant’s confinement to be unconstitutional. (Baxstrom v. Herold, 383 U. S. 107.) The Supreme Court’s decision clearly overruled People ex rel. Brown v. Johnston (9 N Y 2d 482) and People ex rel. Kamisaroff v. Johnston (13 N Y 2d 66) in holding (p. 110): ‘‘ that petitioner was denied equal protection of the laws by the statutory procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York. Petitioner was further denied equal protection of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those, like Baxstrom, nearing the expiration of a penal sentence.”
The sole question to be decided by the court, therefore, is what, if any, compensable damage claimant suffered as a result of his confinement. Damages, of course, would be minimal if he were, in fact, dangerously insane and a fit subject for retention at or commitment to Dannemora.
*535 Although relatively easy to state, the issues are extremely difficult to resolve. A considerable amount of speculation is necessarily involved in attempting to reach a satisfactory conclusion with respect to a person’s potentialities or capacities. That psychiatry and psychology are not exact sciences becomes painfully clear to anyone charged with a fact finder’s responsibility in cases such as that before the court.
It is easy for laymen to simply throw up their arms when confronted with the semantic jungle of psychiatric and psychological concepts and terminology. One psychiatrist testifies that stress may give rise to certain types of psychotic disorders. Another states that stress does not “ cause ” but merely triggers or fosters1 the'appearance of symptoms in an individual with latent psychotic tendencies or psychoses. What then do we mean by the “causes’-’ or by “psychosis”? What appear to be different diagnoses, turn'out to be semantic disputes,-the existence of which are the clearest indication that in the field of psychiatry there are many hypotheses but distressingly few answers.
Ultimately a decision must be based upon which hypothesis or proposed analysis appears most reasonable in the light of a common-sense appraisal of all relevant facts. To this must be added that, when we are concerned with personality traits or mental condition, almost every fact seems to be relevant to one expert or another.
On October 6,1925, the claimant, then 16 years old, pled guilty to an indictment charging him with burglary, third degree, and specifying that he had broken into a roadside stand and stolen about $5 worth of candy. Although he was given a suspended sentence, he violated his terms of probation by failing to report monthly to a minister in his home town, and on August 14, 1926 he was sentenced “ to be confined in New York State Reformatory at Elmira, New York, until discharged by due process of law.”
At Elmira, after observation and psychological testing, lie was classified as a low-grade moron, and on September 15, 1927 he was transferred to the Institution for Male Defective Delinquents at Napanoch. Except for a brief and unsuccessful release on parole, he was confined at Napanoch until March 3,1936. On that date he was transferred to Dannemora State Hospital on the basis of a “ Certificate of Lunacy,” which certified him as insane and attributed the insanity to “ constitutional defects.”
Although his criminal sentence would have expired on September 17, 1936, shortly after he arrived at Dannemora, he was at that time still regarded as insane by the prison author *536 ities and was retained at Dannemora pursuant to the Correction Law provisions discussed above. Finally claimant’s half brother, convinced by correspondence from him that claimant was not insane, set the wheels in motion for the habeas corpus proceeding which resulted in his discharge.
Independent tests administered by three highly qualified psychologists subsequent to claimant’s discharge from Dannemora conclusively established that the claimant possessed average intelligence and that he could not possibly have been a low-grade moron at some other point in his life. In addition, it was obvious that had the claimant not been subjected to the deadening atmosphere of Napanoch and Dannemora for a period of more than 30 years, his performance on the tests administered would have been much better.
It was conceded by claimant’s attorney that the initial 10-year criminal sentence was valid. In addition, the evidence established that during his stay at Napanoch, he exhibited psychotic tendencies and was, in fact, insane for a period of time. The court has concluded, however, that at the time his criminal sentence expired, he had recovered from his insanity in the sense that overtly psychotic behavior had ceased.
What the claimant might have accomplished or what status he might have achieved had he been released after 10 years depended upon the cause and nature of his insanity and the extent to which he would have continued to be disabled by the same. Prior to his conviction, he was unquestionably a maladjusted youth from a broken family, the product of an atmosphere of cultural poverty. In addition, he may have appeared dull, but it was brought out at the trial that a major reason for his so appearing was a purely physical condition which caused his eyelids to droop and which was related in no way to his mental capacity.
Through a tragic error, he was classified as a low-grade moron and shipped to Napanoch which, at least during claimant’s years there, was a repository for unfortunates of varying degrees of imbecility, idiocy and moronity. In People ex rel. Cirrone v. Hoffmann (255 App. Div. 404, 407) the Third Department took judicial notice of the character of that institution during claimant’s confinement there and regarded it as obvious that a person’s 1 ‘ fundamental rights would be infringed * * * were he to be confined with mental defectives whose appearance, speech and personal habits are abhorrent, as clearly as would be the case if he were required to live in a madhouse, or in fear of injury by untrained or unmanageable animals, if *537 lie were constantly subjected to offensive odors, or if confined for long periods to a dungeon or solitary confinement ”.
When the claimant finally cracked and lost touch with reality, such as it was, he was transferred to Dannemora, which, although called a ‘ ‘ hospital, ’ ’ was essentially a prison with facilities for controlling psychotic convicts. His new home may have been a slight improvement; and the record indicates that after his transfer, his condition improved markedly.
The State repeatedly called attention to the fact that the hospital records repeatedly described claimant’s behavior as paranoid, or in lay terms, that he had delusions of persecution. If a person is, in fact, being treated unjustly or unfairly, the fact that he perceives, resents and reacts to the inequity could hardly be regarded as competent and conclusive evidence of paranoia or paranoid tendencies.
From the testimony and exhibits, there emerged a picture of a man full of despair and defeat, who had been condemned by society and confined for what are ordinarily the most productive years of a person’s life. For more than 34 years, he remained in custody — first among idiots and imbeciles and then among men living without hope, sitting day in and day out in a big room looking at each other. He was exposed to indignities and degredation which are difficult, if not impossible, to imagine.
That despair might be reasonable under the circumstances is clear. The theft of $5 worth of candy precipitated a nightmare lasting for more than 34 years.
The conclusion is inescapable that, although the claimant did become psychotic after several years at Napanoch, the psychosis or the appearance of psychotic symptoms was caused by the nature of his confinement. In a sense, society labeled him as subhuman, placed him in a cage with genuine subhumans, drove him insane, and then used the insanity as an excuse for holding him indefinitely in an institution with few, if any, facilities for genuine treatment and rehabilitation of the mentally ill.
Although society may have been responsible for whatever disability resulted from claimant’s erroneous classification as a mental defective, there was no evidence that the psychological tests resulting in such classification were not administered or interpreted in accordance with the then accepted standards in the evaluation of mental capacity. The most reasonable assumption is that the tests that were used at that time were almost entirely verbal and that an individual lacking in verbal skills because of a poor educational or family background would almost inevitably tend to do poorly.
*538 Legitimate reasons existed for the segregation of mental defectives, and the claimant was a victim of the inability of ■science to devise methods or devices for accurately measuring the traits upon which such segregation had to be based. Thus, although claimant’s rights were obviously violated by being confined at Napanoch, the guilt rests not with the State of New York, but with society in general.
The State is responsible, however, for retaining the claimant at Dannemora, and the proof not only justifies but compels the conclusion that if the claimant had been transferred to a civil mental hospital upon the expiration of his sentence or during the four-year period commencing in 1936, his chances of leading a productive and satisfactory life would have been good. Instead, however, he was forced to spend 24 more years in an institution devoted not to rehabilitation or to curing personality disorders, but to controlling the unfortunates suffering from them. It is precisely this orientation toward control rather than cure which gave rise to whatever compensable damage claimant suffered.
Statistics were presented with respect to the average wages earned by production employees during the period of claimant’s wrongful imprisonment. The objective yardstick which such statistics might appear to provide must be tempered as far as any purely economic loss is concerned by the fact that even in 1936 claimant’s adjustment to “ straight ” society would have been difficult. On the other hand, a purely economic approach would not reflect the years of degradation, humiliation and frustration which the claimant experienced.
The court believes that no sum of money would be adequate to compensate the claimant for the injuries he suffered and the scars which he obviously bears. A figure must be set, however, and the court has concluded that the claimant is entitled to recover from the State of New York the sum of $115,000.