Fuchsberg, J.
The defendant, Frank J. Easley, was charged with the commission of the crime of rape in the third degree for engaging in sexual intercourse with one Rita Waller, who, though past her seventeenth birthday, the present age of statutory consent (Penal Law, § 130.05, subd 3, par [a]), was alleged to have been incapable of consenting to such an act because she was "mentally defective” (Penal Law, § 130.25, subd 1; § 130.05, subd 3, par [b]). He now appeals from an order of the Appellate Division affirming a judgment of conviction entered against him after a trial by jury. '
Defendant relies in the main on three propositions: (1) that the trial court committed reversible error when, in instructing the jury on the law, it charged that Ms. Waller’s appreciation of the "moral quality” of the sexual act in which she had participated was a factor to be considered in determining whether she lacked capacity to consent, (2) that, in any event, on the record here, as a matter of law the People failed to prove beyond a reasonable doubt that Ms. Waller was "mentally defective” within the compass of section 130.05 and subdivision 5 of section 130.00 of the Penal Law and (3) that section 130.10 of the Penal Law, under which it would be an affirmative defense if Easley established that he "did not know of the facts or conditions responsible for such incapacity to consent”, deprived him of due process of law by shifting the burden of proof on that question from the People to the defendant. For the reasons which follow, we do not find that any of these contentions warrant a reversal.
Preliminarily, we note these facts:
It was conceded that the act of sexual intercourse on which the prosecution is based took place. It happened at the home of Rita Waller’s grandmother, with whom she had resided since early childhood. Easley was a family friend; for five years immediately preceding the occurrence he was a close neighbor and shortly before the time when the crime of which he was convicted was committed he had actually been a member of the grandmother’s household for three weeks. *53 Presumably on the basis of the knowledge he had so gained, though contending that Ms. Waller’s mental state was not such as to bring it within the embrace of the statute, for all practical purposes he did not deny that he was aware of her condition as it was developed at the trial.
The evidence of that condition included two separate psychological tests performed under the aegis of the special school for the mentally retarded which she attended. One test had been conducted in 1967, when she was 10 years of age; the other, in 1974, was administered shortly before the episode with which we are here concerned. They placed her I.Q. in the 45-54 range, the "moderately retarded” classification (see 9 Encyclopedia Britannica [15th ed], p 673).
The school psychologist, who had observed her hundreds of times at two or three week intervals over a period of 10 years, described her as having "very little control over her impulses”, as "over-anxious” and "dependent”, as at times "difficult to understand and communicate with” and as given to regressive infantile behavior. It was the psychologist’s professional opinion that Ms. Waller was limited in her understanding to "concrete” as opposed to "abstract” matters to a degree where her conceptual comprehension in general, and that of sexual relations in particular, was at the level of an eight-year-old child. She also testified that, while it was possible for Ms. Waller to respond sexually if stimulated, and while she was physically capable of "indulging] in the concrete act of sexual intercourse” and of comprehending that it could result in "having a baby”, she was incapable "of thinking beyond the act in terms of what its consequences could be”.
The grandmother also took the stand. Her testimony was confirmatory of that of the school psychologist as to Ms. Waller’s mentality, demeanor and rapport. She related that she and the defendant had had occasion to discuss this condition. She also described how, over the years, her attempts to broach the subject of sex to her granddaughter had met with almost total incomprehension.
Examined by the court for the purpose of determining if she could be sworn, Ms. Waller did not know what telling the truth meant. As a result, without objection, she testified without affirming or taking an oath. The record reveals that her performance as a witness was replete with shouting, giggling, crying, incoherence, emotionalism and other inappropriate behavior. In the end, defense counsel, in his summa *54 tion, thought it best to acknowledge to the jury that "after observing her * * * along with you, you would have to agree she is mentally retarded.” ‘
Before arraying this proof against the provisions of subdivision 1 of section 130.25 and section 130.05 of the Penal Law, it is also well to note that those statutes are consonant with the general principle that "consent given by one who is mentally inadequate is no consent at all” (see Marks and Paperno, Criminal Law in New York under the Revised Penal Law, § 249; 65 Am Jur 2d, Rape, § 9, pp 766-767; Rape—Mentally Deficient Woman, Ann., 31 ALR3d 1227, esp p 1234). This principle, equally applicable, for instance, where capacity to marry or to contract are at issue, bespeaks society’s special concern for the protection of those lacking capacity to consent (Lindman, Mentally Disabled and the Law [American Bar Foundation, rev ed], p 226; 1 Foster & Freed, Law and the Family, §§2:3, 3:3, 18:37; see Domestic Relations Law, §7, subd 2). In the context of the law of rape, it is reasoned that "[w]hen a man has sexual intercourse with a woman who * * * does not know the nature of intercourse, he has deprived her absolutely of sexual choice and therefore deserves punishment as a rapist, though his victim was unaware of the invasion of rights when it occurred” (Comment, Towards a Consent Standard in Law of Rape, 43 U of Chi L Rev 613, 634).
Specifically, subdivision 5 of section 130.00 of the Penal Law, the definitional section of the statutory scheme under which the defendant here was indicted, succinctly states that "mentally defective” means a person who "suffers from a mental disease or defect which renders him incapable of appraising the nature of his conduct”. The very breadth of this language no doubt reflects the fact that whether a particular defendant’s sexual partner’s mental condition comes within the statute cannot be determined in accordance with precise and inelastic standards.
That is particularly so since the law does not adopt the fiction that all persons are mentally or judgmentally equal. As do all others, the mentally aberrant differ from one another in greater or lesser degree. Even mental retardation does not mean that an individual is incapable of consenting as a matter of law. The requisite degree of intelligence necessary to give consent may be found to exist in a person of very limited intellect (see 1 Wharton, Criminal Law and Procedure, *55 § 310; Hacker v State, 73 Okla Cr 119). Crucial to a determination may be how such a person actually functions in society (Lindman, Mentally Disabled and the Law [American Bar Foundation, rev ed], p 226). It therefore behooves a Trial Judge, in any elaboration or explanation he includes in the instructions he gives to a jury to aid it in understanding and applying the statutory definition, to do so with extraordinary care (see People v Odell, 230 NY 481, 487-488).
In the present case, after twice reading the statutory definition, the Trial Judge added:
"Consent has been defined in one of the cases as requiring the exercise of intelligence based upon knowledge of its significance and moral quality.
"It has also been defined, or capacity to consent has been defined in this relationship, as presupposing the mental capability to form an intelligent opinion on the subject with an understanding of the act, its nature and its possible consequence.”
The defendant excepted to that charge and now maintains that the use of the term "moral quality” was improper. We reject that contention.
The source of the portion of the charge in question appears to have been People v Palvino (216 App Div 319), in which the Appellate Division, Fourth Department, stated (p 321): "Consent to such an act requires the exercise of intelligence, based upon knowledge of its significance and moral quality”. In Palvino the woman with whom the defendant had engaged in sexual intercourse was an escapee from a State institution for epileptics and feebleminded to which she had been committed; her mental age was seven years and two months. Significantly, the court also noted the finding that (p 321) "this female had no sound mentality, and was not able to appreciate the nature of the act” (emphasis added).
Palvino was decided under former subdivision 1 of section 2010 of the Penal Law, the present subdivision 5 of section 130.00’s predecessor. The statute then in force defined the mental condition that would render a female "incapable of giving consent” as one beset by "idiocy, imbecility, or any unsoundness of mind, either temporary or permanent” (emphasis added). However, despite the difference in terminology, it is recognized that the words of the later statute were intended to do "no more than to state the same abnormality *56 in language employed by contemporary psychiatry”. (Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 130.00, p 447.) The key phrases in the two statutes are "incapacity to give consent” in the old one and "incapable of appraising the nature of his conduct” in the present one.
An ability to "appraise” is, of course, a qualitative matter, all the more so when the appraisal is one to be made of the "nature” of "conduct”, with the variety of factors that the one "appraising” may have to take into account for such purposes. Cognitive understanding is involved. In a case such as the one before us, it includes being substantially able to understand what she was doing (see 1 Dowsey, Charges to Jury and Requests to Charge in a Criminal Case, Form 119). An understanding of coitus encompasses more than a knowledge of its physiological nature (see People v Boggs, 107 Cal App 492). An appreciation of how it will be regarded in the framework of the societal environment and taboos to which a person will be exposed may be far more important. In that sense, the moral quality of the act is not to be ignored.
That is to be distinguished, however, from the participating woman’s personal sense of morality. Whether her character is exemplary or depraved is besides the point. The object is not to probe the degree of her conformity or nonconformity to the norms of society. A knowing defiance of social mores, a mere yielding to temptation or passion, even an inclination to vice, these are not the concern of this statute.
But to flout society or to arraign oneself against its views is entirely different from having an understanding, or the capacity to understand, that one is doing so. Whether there is an awareness of the social or other cost of one’s conduct is a legitimate area of inquiry in determining whether one is so mentally defective that the protective shield of section 130.05 of the Penal Law is invoked. Such inquiry should of course include the question of whether the person whose mentality is being judged has insight into the "consequences” of conduct for which the law exacts criminal penalties.
But that is not enough. The law does not mirror all prevailing moral standards (Schwartz, Moral Offenses and the Model Penal Code, 63 Col L Rev 669). Therefore, there also needs to be inquiry as to whether there is a capacity to appraise the nature of the stigma, the ostracism or other noncriminal sanctions which society levies for conduct it labels only as *57 immoral even while it yet "struggles to make itself articulate in law” (see Cardozo, Paradoxes of Legal Science, pp 17, 41-42). Put in terms of this case, in its determination of Ms. Waller’s capacity to appraise the sexual act, its significance and its consequences, the jury may very well have been required to consider the "moral quality” of the act as it would be measured by society and to assess as well her ability to appreciate that fact (cf. People v Wood, 12 NY2d 69, 76-77; People v Schmidt, 216 NY 324).
With these considerations in mind, it was well that the Judge’s charge did not resort to pedantry, but broadly spoke of "the exercise of intelligence”, of "knowledge of the significance” of the thing consented to, of "mental capability to form an intelligent opinion”, of "an understanding of the act”, of its "possible consequence” and of its "nature”. These he mentioned in the conjunctive along with his reference to "moral quality” and they therefore served to qualify that expression. There was no suggestion that the determination of the presence or absence of mental defect could turn on Ms. Waller’s own appreciation of the "moral quality” of her act of sexual intercourse alone; indeed, no special emphasis was put on that factor. Indeed, no factor was elevated over the others and the effect was to present a blend of all these considerations. This encouraged the jury to more freely decide the weight to be accorded to each factor against the perspective of the total picture.
Moreover, the charge did not suggest that Ms. Waller’s own personal moral behavior or sense of values, as distinguished from her awareness of the prevailing moral code, was to enter into the equation by which her "mental capability to form an intelligent opinion on the subject” was to be judged. That would have constituted an impermissible attempt to control her own moral behavior (see Commentary to American Law Institute Model Penal Code, § 207.1 [Tent Draft No. 4], p 204 et seq.).
An examination of the American Law Institute Model Penal Code,* whose language is embodied in our New York Penal Law, makes that especially clear. Both codes use the identical words "the nature” in speaking of the quality of the conduct. *58 The Commentary to the Official Draft of the Model Code expressly states that it was "by specifying that the woman must lack capacity to appraise 'the nature’ of her conduct, [that] we make it clear that we are not talking about appraisals involving value judgments”. (Commentary To Proposed Official Draft [1962], § 213.1, subd [2], par [b].) As already indicated, the trial court used that very phrase "its nature”, as indeed had the court in Palvino, to accomplish the same purpose. And while it may have been preferable to explicitly set out the dichotomy between Ms. Waller’s own sense of morality, on the one hand, and her appreciation of society’s sense of morality, on the other, given the one-sided proof of her long-standing and essentially undisputed condition in this case the failure to do so was harmless.
Furthermore, we conclude that, by the standards the charge articulates, there was sufficient proof on the basis of which the jury had a right to find, as it did, that Ms. Waller was a mentally defective person under the statute beyond a reasonable doubt.
We turn now to defendant’s assertion that section 130.10 of the Penal Law is unconstitutional because it placed the burden of proving that he was unaware of Ms. Waller’s incapacity at the time he engaged in the conduct constituting the sex offense on him. In support of his position he relies largely on Mullaney v Wilbur (421 US 684) (but see People v Patterson, 39 NY2d 288, probable juris noted 429 US 813). The People, on the other hand, argue that knowledge of the mental defect is no more part of the required mens rea of the crime charged than in the statute prohibiting extramarital sexual conduct with females younger than 17, that the affirmative defense was no more than an ameliorative device (see People v Patterson, supra, esp concurring opn [Breitel, Ch. J.]) and that, in any event, Mullaney would at most require New York to convert the affirmative defense into a "defense” which defendant would have been required to, but here did not, place in issue.
However, we find ourselves unable to reach the merits of that issue and the subsidiary questions it gives rise to since, as the People correctly point out, after both sides had rested, counsel for defendant, whose thrust throughout the trial had been to controvert the claim that Ms. Waller’s condition came within the statute rather than whether Easley was aware of it, indicated that no such defense would be made. Indeed, he *59 reiterated that statement during a colloquy with the prosecutor outside the presence of the jury during the People’s summation, leading the court at that time to indicate, without objection, that it would charge the affirmative defense out of the case. It in fact did so. The matter was thus placed beyond our review (People v Robinson, 36 NY2d 224).
Finally, we note that an additional question raised by the defendant, that is whether he was unconstitutionally sentenced as a second felony offender on the basis of a previous conviction in the State of Virginia, must be determined adversely to him on the authority of our recent decision in People v Parker (41 NY2d 21), which is dispositive of that issue.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler, and Cooke concur.
Order affirmed.

 "Gross Sexual Imposition. A male who has sexual intercourse with a female not his wife commits a felony of the third degree if * * * he knows that she suffers from a mental disease or defect which renders her incapable of appraising the nature of her conduct”. (American Law Institute Model Penal Code, § 213.1, subd [2], par [b].)