STATE OF HAWAII, Plaintiff-Appellee *v.* GEORGE GONSALVES, Defendant-Appellant

NO. 9720

(CRIMINAL NO. 57343)

AUGUST 21, 1985

BURNS, C.J., HEEN AND TANAKA, JJ.

660

OPINION OF THE COURT BY TANAKA, J.

Defendant George Gonsalves (Defendant) appeals his conviction of Rape in the Third Degree of a mentally retarded woman under Hawaii Revised Statutes (HRS) § 707-732(1) (Supp. 1984).[1] Defendant contends that the trial court erred (1) in denying his motion for judgment of acquittal since the evidence was insufficient to prove that the victim was "mentally defective"; (2) in finding the victim competent to testify; (3) in admitting into evidence the victim's mother's hearsay testimony; (4) in denying his motion for mistrial based on the mother's prejudicial testimony; and (5) in precluding cross-examination regarding a pending civil suit.[2] We find no error and affirm.

At the time of the offense, the victim was a 28-year old mentally retarded woman who lived with her mother in Kaneohe and worked at Lanakila Crafts in Honolulu. She was driven back and forth to work by Handi-Van transportation service, usually reaching home at about 3:30 p.m. On the day in question, however, she did not arrive home until 4:45 p.m. She was the last passenger on the Handi-Van.

---

[1] HRS § 707-732 reads:

Rape in the third degree. (1) A person commits the offense of rape in the third degree if the person intentionally engages in sexual intercourse with another person who is mentally defective, mentally incapacitated, or physically helpless.

(2) Rape in the third degree is a class C felony.

[2] Defendant also claims that the trial court erred in admitting the victim's prior consistent statement made to the police and in not admitting into evidence his prior consistent statement to the police. Those claims are without merit. The victim's prior consistent statement was admissible under Rule 613(c)(3), Hawaii Rules of Evidence (HRE), since the victim's memory was previously attacked by defense counsel. However, Rule 613(c) was inapplicable to Defendant's prior consistent statement.

Upon her arrival at home, the victim appeared tired and dejected to her mother. The mother asked if something had happened. When the victim said that something had, the mother asked if the driver had "put his stuff" in her. The mother received an affirmative reply. Following her daughter into the bathroom, the mother noticed blood smeared on her thighs. When the mother asked the victim if she was menstruating, she responded that she was not, but that because of what Defendant had done, "it" was sore. The doctor who examined her two and a half hours later found that the blood, which was still oozing, came from a torn hymen. Tests revealed the presence of seminal fluid and spermatozoa in the victim's vagina. The victim's father called the police. When asked by the police where the incident had occurred, the victim replied that it was where her mother's friends had held their weddings, meaning Haiku Gardens.

Defendant was arrested that evening. Defendant claimed that he reversed his normal route for a change of pace, and denied having sexual intercourse with the victim. Defendant later testified that he did stop off at Haiku Gardens, but only after he dropped the victim off.

After a voir dire examination as to the victim's ability to tell the truth pursuant to Rule 603.1(2), Hawaii Rules of Evidence (HRE), the victim was permitted to testify at trial. The jury found Defendant guilty and Defendant appeals.

## I. VICTIM'S MENTAL CAPACITY

Defendant's argument poses a Catch-22. First, he alleges that if the victim was mentally defective, then she was incompetent to testify. Second, he claims that if the victim was able to testify, then she was not mentally defective under the statute. However, this argument is an erroneous characterization of the issues. The mental abilities relating to testimonial competency and signifying mental defect must be evaluated separately. *State v. Peters,* 441 So.2d 403, 409 (La. App. 1983). Ability to testify involves understanding the nature of the duty to tell the truth, i.e., to be able to tell fact from falsehood. Mental defect, on the other hand, concerns the inability to appraise conduct, which involves the intellectual ability to make abstractions.

## A. *"Mentally Defective"*

Defendant asserts that the State's evidence was insufficient to prove that the victim was "mentally defective." We disagree.

Sexual intercourse with a mentally defective person is characterized as rape under the principle that "consent given by one who is mentally inadequate is no consent at all." *People v. Easley,* 42 N.Y.2d 50, 54, 364 N.E.2d 1328, 1331, 396 N.Y.S.2d 635, 639 (1977). Thus many statutes, like Hawaii's, omit the requirement of force. *See* Annot., 31 A.L.R.3d 1227 (1970). Sexual intercourse with a mentally defective person is all that is required for a conviction under HRS § 707-732(1).

The statute defines a person to be "mentally defective" if the person suffers "from a disease, disorder, or defect which renders him incapable of appraising the nature of his conduct." HRS § 707-700(12) (Supp. 1984). This definition appears to have been borrowed from Model Penal Code §213.1(2)(b): a third degree felony is committed if a male has intercourse with a woman who "suffers from a mental disease or defect which renders her incapable of appraising the nature of her conduct[.]"[3] Of the jurisdictions adopting this section, one appellate case has discussed this language in depth and formulated a workable test.

*People v. Easley, supra,* points out that appraisal of conduct cannot mean just an understanding of the physiological elements of the sex act. Rather, it must include an understanding of the moral and societal elements of the act:

> An appreciation of how [sexual intercourse] will be regarded in the framework of the societal environment and taboos to which

---

[3] Defendant seeks to use selected portions of the commentary to the Proposed Official Draft to demonstrate that only manifestly and seriously deranged women are to be protected. However, the commentary to the Official Draft states that:

> The . . . test [of whether the woman could express any judgment on the matter] was rejected because it gives too little scope[.] Only a female suffering from extreme retardation or some catastrophic psychological disability would be incapable of saying "yes." *Many persons of lesser impairment should be included within this protection*[.]

Model Penal Code and Commentaries § 213.1 at 321 (1980) (emphasis added). Since the commentaries are not consistent, we look elsewhere for guidance.

a person will be exposed may be far more important. In that sense, the moral quality of the act is not to be ignored.

\* \* \*

[There needs to be] inquiry as to whether there is a capacity to appraise the nature of the stigma, the ostracism or other non-criminal sanctions[.]

*Id.* at 56, 364 N.E.2d at 1332-33, 396 N.Y.S.2d at 639-40. *See also People v. Gross,* 670 P.2d 799 (Colo. 1983), *People v. McMullen,* 91 Ill. App. 3d 184, 414 N.E.2d 214 (1980). Additionally, the woman must have the ability to appraise the possible medical consequences of the act. Today, unfortunately, sexually transmitted diseases are not only prevalent, but some are incurable and others can be fatal.[4]

Without the ability[5] to comprehend these factors, the victim cannot be said to be capable of appraising the nature of the act. She would see only the shiny wrappings on Pandora's box, and none of the contents. She would be truly, in the old-fashioned phrase, taken advantage of.

In this case, the victim's IQ is 40, which is in the moderately retarded range.[6] She was found to be functioning intellectually at the level of "a three- or four-year-old child." Tr., Vol. II, at 11. As for her comprehension, the psychologist at trial testified:

I don't think that she could make intelligent decisions where it involved judgment beyond just a very simple task of how she might put on her clothing or something such as that. At this level of intelligence, we do not expect people to be able to abstract, to know what might happen beyond the present moment based on any judgment they might make. She couldn't

---

[4] We do not consider these to be remote consequences of the act; rather, they all spring directly from the act and are components of the normal woman's decision to participate.

[5] This statute does not, of course, cover the merely ignorant; the legislation protects only those who cannot understand.

[6] According to the Encyclopaedia Britannica, an IQ of 54-40 indicates moderate retardation, and 39-25 indicates severe retardation. 21 *The New Encyclopaedia Britannica* at 713 (15th ed. 1985).

predict what might happen if she did one thing and was later faced with the consequence. If she did something now, she wouldn't know what might happen in the future because of her action.

*Id.* at 10. The victim's trial testimony bears out this evaluation. For instance, she knows that it is wrong to leave the house while she is alone, but does not know why it is wrong. Tr., Vol. I, at 62. She knows that she is not a dog, but is unable to analyze why. *Id.* at 39, 41. The record shows that the victim was not functioning at a level where she could take abstract or long-term consequences of behavior into consideration.

When the other substantive evidence against the defendant is taken into account, the trial court did not err in its denial of defendant's motion for acquittal on the basis that mental defectiveness had not been shown. Viewing the evidence in the light most favorable to the State, and giving full play to the right of the jury to weigh credibility and the evidence, a reasonable mind could fairly conclude that substantial evidence existed to find that defendant was guilty beyond a reasonable doubt. *State v. Brighter,* 62 Haw. 25, 608 P.2d 855 (1980).

### B. *Testimonial Competency*

Defendant contends that the trial court erred in allowing the victim to testify. Under Rule 603.1, HRE, a person is disqualified to be a witness if he is incapable of understanding the duty to tell the truth. The question of competency of a witness to testify is addressed to the· trial court's discretion. *State v. Hassard,* 45 Haw. 221, 365 P.2d 202 (1961). Consequently, the appropriate standard of appellate review is the abuse of discretion test.[7] *See* 81 Am. Jur. 2d *Witnesses* § 93 (1976).

---

[7] Although recognizing that testimonial competency is a matter of discretion of the trial court, the supreme court has stated that "its ruling . . . may not be disturbed on appeal unless it is clearly erroneous." *State v. Dameg,* 51 Haw. 308, 309, 459 P.2d 193, 194 (1969). *See also Territory v. Martin,* 39 Haw. 100 (1951); *Territory v. Sabado,* 38 Haw. 486 (1950). We believe that since the trial court has the discretion, the applicable standard of appellate review should be the abuse of discretion test.

In this case it is clear from the victim's voir dire examination that she was operating at a limited intellectual level.[8] She did not appear to be inventing her answers, and answered "I don't know" when she did not know the answer to the question posed. She was unclear about the nature of jail, but her other responses support the conclusion that she understood the duty to tell the truth.

This type of issue is peculiarly for the trial judge, who views the demeanor of the proposed witness and weighs his manner and responses as well as his words. *Territory v. Titcomb,* 34 Haw. 499, 503 (1938). The trial court did not abuse its discretion in allowing the victim to testify. *Cf. People v. McMullen, supra,* (victim deemed mentally incompetent under rape statute but was allowed to testify).

## II. MOTHER'S HEARSAY TESTIMONY

Defendant argues that the testimony of the victim's mother concerning her dialogue with the victim when she returned home was inadmissible hearsay. He denies the applicability of the res gestae exception since the victim's accusation came in responses to her mother's questions.

Were the victim of normal intelligence, we might agree.[9] But in analogous situations involving children, many jurisdictions hold that questions do not necessarily destroy res gestae statements. *See Beausoliel v. United States,* 107 F.2d 292, 295 (D.C. Cir. 1939); *United States v. Nick,* 604 F.2d 1199 (9th Cir. 1979); *State v. Bouchard,* 31 Wash App. 381, 639 P.2d 761 (1982); cases cited at Annot., 83 A.L.R.2d 1368 at §10 (1962), and Annot., 80 A.L.R.3d 369 at §3 (1977). We have found no case where the testimony involves the same type of leading questions involved here, but we note that "more latitude is allowed where the offended person is a child or of feeble intellect[.]" *Conoway v. State,* 171 Ga. 782, 785, 156 S.E. 664,

---

[8] Defendant argues that the victim is on the level of a three- or four-year old and the average three- or four-year old cannot distinguish between truth and a lie, so the victim is incompetent to testify. We cannot credit this argument: under Rule 603.1, HRE, age is not an automatic disqualification.

[9] *But see McCormick on Evidence* at 857 (3d ed. 1984).

666 (1931). Where the victim was mentally retarded, the questions were prompted by a marked change in demeanor, and the questions and responses occurred as soon as the victim arrived home, we find sufficient indicia of a res gestae exception to the hearsay rule. *See Territory v. Kinoshita,* 38 Haw. 335 (1949).

Additionally, the victim testified to the same facts at trial, and compelling evidence exists as to Defendant's guilt: the presence of spermatozoa, the recent superficial hymenal laceration, and continued bleeding that evening. Even if the mother's testimony was inadmissible, no prejudice to Defendant would have occurred. *State v. Nakamura,* 65 Haw. 74, 648 P.2d 183 (1982).

### III. MOTION FOR MISTRIAL

Defendant requested and was granted a pretrial motion in limine to keep from the jury the fact that a somewhat similar incident had allegedly occurred between Defendant and the victim the previous week.[10] During the direct examination of the victim's mother, she interjected allusions to something that had happened the previous Friday approximately eight times. At no time did defense counsel object or ask to approach the bench to enforce the order granting the motion in limine. However, Defendant asserts that the trial court erred in failing to grant his motion for mistrial.

The general rule is that when an "improper answer is given to a proper question, the remedy is a motion to strike. Absent such motion, the answer will generally not be considered when urged on appeal as prejudicial." *State v. Hashimoto,* 46 Haw. 183, 195, 377 P.2d 728, 736 (1962). This rule holds true for answers given in violation of the motion in limine order. *See, e.g., State v. Evans,* 639 S.W.2d 820 (Mo. 1982), *Zehner v. Post Oak Oil Co.,* 640 P.2d 991 (Okla. App. 1981).

The appropriate procedure, we believe, is:

[I]f the order is violated, the moving party should not be required to voice an objection in the presence of the jury. Instead, he should simply be expected to approach the bench to remind the court of the provisions of the pretrial order and to

---

[10] Defendant's motion in limine was heard and orally granted by the trial court before the selection of the jury.

request the application of the appropriate sanctions. This will eliminate the risk of sensitizing the jury to the excluded evidence and, at the same time, will protect the moving party against charges that he has waived his objection for purposes of appeal.

Note, *Pretrial Exclusionary Evidence Rulings,* 1967 Wis. L. Rev. 738, 757 (footnotes omitted).

We realize that the purpose of a motion in limine is to keep evidence away from the ears of the jury, and that an objection in open court can bring undue attention to the statement. But in this case, the prosecutor asked no questions violating the motion in limine order; the superfluous information came forth spontaneously from the witness. The first mention of the subject was quite innocuous:

Q: How were you feeling when she wasn't home at [3:30]?
A: I was very apprehensive because I know that something had happened the week before.

Tr., Vol. I, at 81. There is no specific reference to Defendant, or even a reasonable implication that the prior occasion involved him and not an incident at work. Had defense counsel sought to enforce the motion in limine order at that point, no further remarks would probably have been made, or, being made, they may have justified the application of sanctions.

## IV. CROSS-EXAMINATION REGARDING PENDING CIVIL SUIT

During cross-examination of the victim's mother, defense counsel stated:

Q: I noticed you filed a civil suit.
A: Huh?
Q: You filed a civil suit stemming from —
[Prosecutor]: I'm going to object.
[Defense counsel]:I believe this goes to bias and prejudice, Your Honor.

Tr., Vol. I, at 96. The trial court concluded that since the result in the criminal trial would not be admissible in the civil case, testimony

concerning the family's civil suit had no "probative value for [the criminal] case," and sustained the objection. Tr., Vol. I, at 97.

The court clearly erred, for under *Asato v. Furtado*, 52 Haw. 284, 474 P.2d 288 (1970) and *State v. Liuafi*, 1 Haw. App. 625, 623 P.2d 1271 (1981), a criminal conviction can be used as evidence in the civil suit, and it is error not to allow cross-examination to reveal possible biases or ulterior motives. The question before us is whether the error was harmless beyond a reasonable doubt. *Liuafi*, *supra*.

We note again that the physical evidence pointed to a very recent act, and that the victim told her mother that because of what Defendant did, she was sore and bleeding.[11] Moreover the jury certainly knew that the victim's mother was biased, simply because she was her mother.

Given the strong evidence against Defendant and the mother's evident natural bias, we cannot say that there is a reasonable doubt that precluding exploration of this area in cross-examination contributed to the conviction. The error was harmless beyond a reasonable doubt.

Affirmed.

*Samuel P. King, Jr.* for defendant-appellant.

*Peter Van Name Esser* (*Arthur E. Ross* on the brief), Deputy Prosecuting Attorneys, for plaintiff-appellee.

---

[11] We also note the coincidence that both versions of the story put Defendant at Haiku Gardens between 4:30 p.m. and 4:45 p.m.: the victim states that the act occurred there and that she arrived home at 4:45 p.m., while Defendant claims he dropped her off at 4:30 p.m. and then went there.