Appellant, Donald Lee Brooks, was indicted and brought to trial on three counts of sodomy in the second degree and three counts of sexual misconduct, in violation of §§ 13A-6-64(a)(2) and -65(a)(3), Code of Alabama 1975, respectively. Prior to submission of the case to the jury, the trial court granted defense motions for judgments of acquittal as to the three sexual misconduct counts; however, it allowed the sodomy counts to be submitted to the jury. The jury found appellant guilty as charged in each of the sodomy counts, and the court sentenced him to ten years' imprisonment on each count, with the sentences to run concurrently. He appeals, raising one issue. He contends that the state failed to prove that the alleged victim of the sexual *Page 1135 
acts charged was incapable of consent by reason of being "mentally defective," an essential element of the offenses for which he was convicted, and that reversible error occurred when the trial court denied his motions for judgments of acquittal on that ground.
The facts concerning the sexual acts charged, as testified to by the victim, are not contradicted. The 17-year-old victim, D. E., resided in the Methodist Children's Home in Mobile County. Appellant enticed him away from the home at night, took him to a location where he gave him beer to drink and a pill to calm his nerves, persuaded him to remove his clothing and lie on a bed, performed anal and oral sex upon him, and persuaded him to perform oral sex upon appellant. While the facts describing the sexual acts themselves are not disputed, the question of whether the alleged victim was incapable of consenting to the acts, by reason of being mentally defective, is disputed.
Section 13A-6-64(a)(2) provides as follows: "A person commits the crime of sodomy in the second degree if . . . [h]e engages in deviate sexual intercourse with a person who is incapable of consent by reason of being mentally defective." "Sections13A-6-63 [sodomy in the first degree] and 13A-6-64 are directed toward those acts, sexual in nature, committed on persons without consent, under circumstances where normal sexual intercourse would be considered rape, and they correspond to §§ 13A-6-61 [rape in the first degree] and 13A-6-62 [rape in the second degree] in their degrees and classifications." Commentary to §§ 13A-6-63 and 13A-6-64. Consent is defined in §§ 13A-2-7 and 13A-6-70. Section 13A-2-7 provides, in pertinent part, as follows:
 "(a) In general. — The consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives a required element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense.
". . . .
 "(c) Ineffective consent. — Unless otherwise provided by this Criminal Code or by the law defining the offense, assent does not constitute consent if:
". . . .
 "(2) It is given by a person who by reason of immaturity, mental disease or defect, or intoxication is manifestly unable . . . to make a reasonable judgment as to the nature or harmfulness of the conduct; or
 "(3) It is given by a person whose consent is sought to be prevented by the law defining the offense. . . ."
Section 13A-6-70 provides, in pertinent part:
 "(a) Whether or not specifically stated, it is an element of every offense defined in this article, with the exception of subdivision (a)(3) of section 13A-6-65 [sexual misconduct], that the sexual act was committed without consent of the victim.
"(b) Lack of consent results from:
". . . .
"(2) Incapacity to consent; . . .
". . . .
 "(c) A person is deemed incapable of consent if he is:
"(1) Less than 16 years old; or
"(2) Mentally defective; or
"(3) Mentally incapacitated; or
"(4) Physically helpless."
"Subdivisions (c)(2), (c)(3), and (c)(4) deal with those persons who, temporarily or permanently, are at the time of the act either unable to appraise the nature of their acts or to resist those acts." Commentary to § 13A-6-70.
Section 13A-6-60(5) defines the term "mentally defective" as follows: "Such term means that a person suffers from a mental disease or defect which renders him incapable of appraising the nature of his conduct."
An essential element, which the state was required to prove in each of the charges upon which appellant stands convicted, was that the victim was incapable of consent by reason of being mentally defective, as that term is defined in § 13A-6-60(5). The breadth of the language *Page 1136 
used by the legislature in defining "mentally defective" "reflects the fact that whether a particular defendant's sexual partner's mental condition comes within the statute cannot be determined with precise and inelastic standards." People v.Easley, 42 N.Y.2d 50, 53, 396 N.Y.S.2d 635, 637,364 N.E.2d 1328 (1977). Section 13A-2-7(c)(2), gives some guidance. It provides that assent does not constitute consent if a person, by reason of mental disease or defect, is manifestly unable to make a reasonable judgment as to the nature or harmfulness of the conduct. The term "mentally defective," as it is used in describing criminal offenses, normally designates an individual of marked subnormal intelligence, a person who has never possessed a normal degree of intellectual capacity. UnitedStates v. Hansel, 474 F.2d 1120, 1124 (8th Cir. 1973); Peoplev. Hoffman, 255 A.D. 404, 406, 8 N.Y.S.2d 83, 85 (1938); Statev. Degrenier, 120 N.H. 919, 424 A.2d 412, 413 (1980).
Article 130 of the New York Revised Penal Law sheds light on the meaning of the term "mentally defective" as it is used in sex offense statutes. In describing sexual offenses, New York's statutory scheme is similar to Alabama's; like ours, it provides that a mentally defective person is incapable of consent in crimes where an element of the offense is that the act was committed without the consent of the victim. See New York Revised Penal Code § 130.05. The term "mentally defective"is defined identically in the statutes of the two states. We find, in the Commentaries to Article 130, as follows:
 "Of these three forms of incapacity, only the concept 'mentally defective' rests on a mental disease or defect [§ 130.00(5)]. The other two forms, 'mentally incapacitated' and 'physically helpless,' refer more to people who have no mental disease or defect but who are temporarily, for a variety of reasons, not able to make a rational, free-will determination to consent, or not able to communicate an unwillingness to consent, to sexual activity [§ 130.00(6) (7)].
 " 'Mentally defective' requires, in addition to suffering from a mental disease or defect, that such disease or defect render the victim 'incapable of appraising the nature of his conduct' [§ 130.00(5)]. An ability to appraise requires an understanding of a variety of factors. There must be an understanding of the physiological nature of the sexual activity and its consequences. There must be an ability to understand and appreciate how such conduct will be 'regarded in the framework of the societal environment and taboos to which a person will be exposed. . . . In that sense, the moral quality of the act is not to be ignored.' People v. Easley, supra, 42 N.Y.2d at 56 [396 N.Y.S.2d 635, 364 N.E.2d 1328].
"Donnino, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 39, Penal Law, § 130.0, pp. 572-73.
The New York Court of Appeals has addressed this issue at length in People v. Easley, and we quote, with approval, from that opinion:
 "An ability to 'appraise' is, of course, a qualitative matter, all the more so when the appraisal is one to be made of the 'nature' of 'conduct', with the variety of factors that the one 'appraising' may have to take into account for such purposes. Cognitive understanding is involved. In a case such as the one before us, it includes being substantially able to understand what she was doing (see 1 Dowsey, Charges to Jury and Requests to Charge in a Criminal Case, Form 119). An understanding of coitus encompasses more than a knowledge of its physiological nature (see People v. Boggs, 107 Cal.App. 492, 290 P. 618). An appreciation of how it will be regarded in the framework of the societal environment and taboos to which a person will be exposed may be far more important. In that sense, the moral quality of the act is not to be ignored.
 "That is to be distinguished, however, from the participating woman's personal sense of morality. Whether her character is exemplary or depraved is beside the point. The object is not to probe the degree of her conformity or nonconformity to the norms of society. A knowing *Page 1137 
defiance of social mores, a mere yielding to temptation or passion, even an inclination to vice, these are not the concern of this statute.
 "But to flout society or to arraign [sic] oneself against its views is entirely different from having an understanding, or the capacity to understand, that one is doing so. Whether there is an awareness of the social or other cost of one's conduct is a legitimate area of inquiry in determining whether one is so mentally defective that the protective shield of section 130.05 of the Penal Law is invoked. Such inquiry should include the question of whether the person whose mentality is being judged has insight into the 'consequences' of conduct for which the law exacts criminal penalties.
 "But that is not enough. The law does not mirror all prevailing moral standards (Schwartz, Moral Offenses and the Model Penal Code, 63 Col.L.Rev. 669). Therefore, there also needs to be inquiry as to whether there is a capacity to appraise the nature of the stigma, the ostracism or other noncriminal sanctions which society levies for conduct it labels only as immoral even while it yet 'struggles to make itself articulate in law' (see Cardozo, Paradoxes of Legal Science, pp. 17, 41-42)."
42 N.Y.2d at 56-57, 396 N.Y.S.2d at 639-40, 364 N.E.2d at 1332-33.
The evidence presented by the state to establish that the victim was incapable of consent by reason of being mentally defective came from two psychologists, Dr. Joseph Law and Dr. Thelma Givens. Dr. Law, psychologist with the Veterans' Administration, had examined the victim about two months prior to the incident to determine his intelligence, in order to pass upon his application for Social Security disability benefits. Law found that the victim had a verbal scale I.Q. of 71, a performance scale I.Q. of 72, and a full scale I.Q. of 69. He determined that the victim could not be expected to go higher than the fifth or sixth grade and that his mental age was that of a 12-year-old. He concluded that he would have difficulty recognizing moral and legal obligations. He found the victim to be mildly or borderline retarded, stating that the technical term for someone with the victim's I.Q. was "borderline retarded range of intellectual function."
Dr. Givens examined the victim about three-and-a-half months after the incident. The purpose of the evaluation was to determine the victim's need for therapy, in view of the fact that he was retarded. She determined that he was limited in his verbal expressive skills, his reasoning skills, and his ability to generate responses. Her diagnosis was that he suffered from "adjustment disorder with mixed disturbance of feelings and conduct." She found him very cooperative, compliant, and submissive with adults. She stated that if the victim was told to do something, he would try his best to please. She attributed these characteristics to his having lived in foster and group homes and, for this reason, these characteristics would be more pronounced in him than in other retarded children. She determined that he had strong security needs and strong needs for attention and affection, could be "fooled" easily, was a follower, and could be easily intimidated. She determined that he functioned on a level with third-grade youngsters of the age of eight or nine and that his mental age was about twelve, although he could not compete intellectually with a twelve-year-old. She found that his understanding of right and wrong was governed by obedience to what others taught him and that his concept of morality was that of a young child, i.e., that he merely knows something is wrong because he has been told not to do it and that he does not understand, in adult terms, the reasons why it is wrong or all the possible harm that can come to him.
After reviewing the evidence presented by the state and considering it in light of the requirements of the statute, we conclude that there was sufficient proof that the victim was suffering from a mental defect which rendered him incapable of appraising the nature of his conduct. The young retarded victim of subnormal intelligence, functioning at a mental level of a 12-year-old, with his background and susceptibility *Page 1138 
to the influence of adults, could not have been expected to make a reasonable judgment as to the nature or harmfulness of the acts of sodomy perpetrated upon him. It cannot be seriously argued that this young man had the mental capacity to appreciate how the acts would be regarded in his social environment and to appreciate the taboos of his society, or the stigma and ostracism to which he would be exposed. Clearly, it has been established here that the victim was suffering from a mental defect that rendered him incapable of appraising the nature of his conduct. There was abundant evidence upon which to submit to the jury the question of whether the victim was incapable of consent by reason of being mentally defective. Appellant's motions for judgments of acquittal were due to be denied.
Accordingly, the judgments of the trial court are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.