■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICHARD DEAN, Appellant. [894 NYS2d 596]—

Lahtinen, J. Appeal from a judgment of the County Court of Broome County (Cerio, Jr., J.), rendered November 24, 2008, convicting defendant following a nonjury trial of the crimes of rape in the second degree and endangering the welfare of a mentally incompetent person.

Defendant and the victim are adults who have mental impairments such that both are in the bottom one percent of the range of human intelligence. Defendant's IQ is 64 and he functions at a higher level than the victim, whose IQ is 52. They had known each other for many years when, in February 2007, they engaged in sexual intercourse. In June 2007, the social worker assigned to the victim at the sheltered workshop where she worked received a call from the victim's mother indicating that the victim might be pregnant. A home pregnancy test revealed she was pregnant and, shortly thereafter, the victim visited her doctor who confirmed such fact. However, it was determined that the unborn child had severe physical disabilities and that the child would not live after birth. The victim elected to continue the pregnancy to term, and the child died on the date of birth in mid-September 2007.

After the victim's pregnancy was confirmed, a relative of the

victim told police that the victim had been forced by defendant to have sex. Upon questioning by police, defendant acknowledged that he had sex with the victim, but maintained that it was consensual as he characterized her as his girlfriend. He was nevertheless indicted on two counts, one for rape in the second degree for engaging in sexual intercourse with a person allegedly incapable of consent by reason of mental disability (*see* Penal Law § 130.30 [2]) and a second count for endangering the welfare of an incompetent person (*see* Penal Law § 260.25). Following a nonjury trial, defendant was convicted of both counts. He was sentenced to six months of incarceration and 10 years of probation. Defendant appeals.

We consider first defendant's weight of the evidence argument. Where, as here, an acquittal would not have been unreasonable, we "must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (*People v Danielson*, 9 NY3d 342, 348 [2007]; *see People v Richardson*, 55 AD3d 934, 935 [2008], *lv dismissed* 11 NY3d 857 [2008]). "Based on the weight of the credible evidence, [we] then decide[ ] whether the [factfinder] was justified in finding the defendant guilty beyond a reasonable doubt" (*People v Danielson*, 9 NY3d at 348 [citation omitted]; *see People v O'Neil*, 66 AD3d 1131, 1132, [2009]; *People v Parks*, 53 AD3d 688, 692 [2008]; *People v Clayton*, 17 AD3d 706, 707 [2005]; *People v King*, 265 AD2d 678, 679 [1999], *lv denied* 94 NY2d 904 [2000]). Such analysis necessarily includes considering whether all the elements of the crime were established (*see People v Danielson*, 9 NY3d at 349).

A necessary element in this case was whether the victim was incapable of consenting to the conduct with defendant. "Our jurisprudence recognizes certain limitations on the ability of a legally incapacitated person to consent to participate in sexual relations" and "[t]hat limitation is an exercise of the [s]tate's *parens patriae* interest, invoked only where the individual is deemed unable to make a competent decision concerning a fundamental right" (*People v Cratsley*, 86 NY2d 81, 86 [1995]). The burden to establish legal incapacity in such regard is "a high one" as "[t]he law does not presume that a person with mental retardation is unable to consent to sexual intercourse, and proof of incapacity must come from facts other than mental retardation alone" (*id.* at 86 [citation omitted]; *see People v Easley*, 42 NY2d 50, 54 [1977]). A relevant consideration is whether the encounter was primarily exploitative of the victim since that is "the type of harm the law most seeks to guard against by this provision" (*People v Cratsley*, 86 NY2d at 88; *see*

*People v Patterson*, 165 AD2d 886 [1990], *lv denied* 76 NY2d 989 [1990] [the defendant was an employee at an adult home and had sex with a mentally impaired resident]; *People v Dixon*, 66 AD2d 971 [1978] [the defendant was a bus driver for mentally impaired persons and used that position to engage in sexual activity with a mentally impaired woman]; *see also People v Thompson*, 142 Cal App 4th 1426, 1429, 48 Cal Rptr 3d 803, 804 [2006] ["it is the proper business of the state to stop sexual predators from taking advantage of developmentally disabled people"]).

Review of the record reveals that defendant and the victim had known each other for at least 10 years. The victim's sister had been defendant's prior girlfriend and they had two children during their relationship. The victim's parents (who also have mental impairments) were aware that defendant and the victim were spending time together. Prior to her relationship with defendant, the victim had a boyfriend at the sheltered workshop where she worked and that relationship was characterized by an employee from the workshop as a loving one. While defendant functioned at a higher level than the victim and had even been able to obtain a driver's license, both tested in the bottom one percent of human intelligence. Defendant's expert testified convincingly that defendant viewed the victim (and her family) as his peers. In her unsworn testimony, the victim acknowledged that defendant had given her a ring. There were photographs of the victim and defendant together, including one depicting the victim leaning her head on defendant's shoulder as they sat together on a couch and another of the victim sitting on defendant's lap. Although these photographs were not included in the record, their content is not disputed and they were described by one witness as reflecting mutual affection. The victim's treating physician stated at trial that the victim related that she was happy to be having a baby. The record reflects that the victim was given autonomy by medical care providers regarding reproductive choices. These choices included her decision to carry the pregnancy to full term and her subsequent decision to use birth control. As to the latter of these choices, we note that defendant's conviction, if upheld, would make it likely that virtually anyone who engaged in sex with her would be committing a crime. While proof was presented supporting the conviction, we are unpersuaded, after independently considering and weighing the evidence from this nonjury trial, that such proof satisfied the People's high burden of establishing that the victim lacked the mental capacity to consent to sex with defendant under the circumstances of this case.

The remaining issues are academic.

Peters, J.P., Rose, Malone Jr. and Kavanagh, JJ., concur. Ordered that the judgment is reversed, on the facts, and indictment dismissed.